## STATE v. JAMES.

1. VOIR DIRE—OPPOSITION TO CAPITAL PUNISHMENT.—The Circuit Judge being the trier of the fact whether a juror is indifferent, there was no error of law in the rejection by the judge of a juror in a murder case, who declared himself opposed to capital punishment.

2. IBID.—FORMED OPINION.—For the same reason there was no error of law in rejecting a juror who said he could find a verdict according to the law and evidence, but had been a juror on the trial of defendant's accomplice and would discredit the testimony of some of the witnesses.

3. IBID.—IBID.—There was no error in accepting a juror who thought, from what he had heard of the case, that defendant was guilty, but felt that he could render a fair and impartial verdict according to the law and the evidence.

4—34

4. EVIDENCE—ACTS AND DECLARATIONS OF CONSPIRATORS.—How far the acts and declarations of a conspirator are admissible in evidence against his co-conspirators, considered.

5. IMPROPER EVIDENCE WITHDRAWN.—Where evidence improperly received was withdrawn from the consideration of the jury, this court refused to grant a new trial moved for on the ground that the jury had heard the testimony.

6. EVIDENCE—ACT OF CONSPIRATOR.—There was no error in permitting a witness to describe the movements of defendant's alleged co-conspirator after the homicide had been committed.

7. EVIDENCE—DECLARATIONS OF DECEASED.—Defendant contending that two negro men had killed deceased because of their jealousy towards him on account of his relations with their wives, proved by a witness that deceased had once bought four fish and given one to each of two negro women. *Held,* that what deceased said when he presented these two fish was not improperly excluded.

8. CONFIDENTIAL COMMUNICATIONS BY AN ACCOMPLICE—WAIVER.—An attorney will not be required to disclose confidential communications made to him by his client, although such client had afterwards taken the stand and testified as a State's witness against the defendant and admitted that he was an accomplice in the crime. May the client waive this privilege? If he can, the waiver must be distinct and unequivocal.

Before WITHERSPOON, J., Darlington, March, 1890.

The opinion states the case. ·

*Messrs. E. K. Dargan* and *Dargan & Thompson,* for appellant.

*Mr. Johnson,* solicitor, contra.

January 26, 1891. The opinion of the court was delivered by

MR. JUSTICE McGOWAN. At the June term of the Court of General Sessions for Darlington (1888), the defendant, Joseph W. James, and his co-defendants, William Scott and Lewis Williams, were arraigned upon an indictment for the murder of Joseph James, the father of the defendant, on May 8, 1888. The indictment contained three counts : the first charged William Scott, Lewis Williams, Robert Arthur, and the defendant as principals ; the second charged Lewis Williams as principal ; and

the third charged Scott, Arthur, and the defendant as accessories before the fact. . On motion of the defendant the case was continued. At the October term, 1888, on motion of the defendant and Lewis Williams, an order was passed by his honor, Judge Aldrich, granting each of them a separate trial, and thereupon the case was again continued. The solicitor having elected to try the defendant James first, the case came on for trial before his honor, Judge Pressley, and a jury, at the March term, 1889. The jury found the defendant guilty, and he was sentenced to be hanged, but upon appeal to the Supreme Court he was granted a new trial. See 31 S. C., 225, where an outline of the facts are given.

At the March term, 1890, the case again came on for trial before his honor, Judge Witherspoon. In organizing the jury, C. C. Best was sworn on his *voir dire*. Among other things, he declared that he was opposed to capital punishment. The judge ruled that he was not an impartial juror and ordered him to stand aside. Defendant excepted. One Woodham was called to the book and upon examination on his *voir dire*, he said that he had expressed an opinion as to the guilt or innocence of the defendant; that he discredited some of the witnesses who were examined on the trial of Williams, and if the same witnesses were sworn again in the trial of James, he would still discredit their evidence. The judge ordered the juror to stand aside, and defendant excepted. J. T. Howle was presented and sworn on his *voir dire*. He said that from what he had heard about the case, he thought the defendant was guilty; but he solemnly swore that he could go on the jury and render a fair and impartial verdict according to the law and the evidence. The judge directed the juror to be presented, and the defendant excepted. The defendant's peremptory challenges were all exhausted before the panel was completed.

The jury being organized, the trial proceeded, and during its progress several questions arose as to the admissibility of certain testimony, which we will endeavor to consider in connection with the exceptions. Under the charge of the judge, the jury again found the defendant guilty, and he was again sentenced to be hanged on Friday, May 9, 1890. The defendant again appeals

to this court and moves for a new trial. But the case having been postponed by the parties, the appeal was not heard until November 26, 1890, and we will now consider his exceptions *seriatim.*

I. "Because his honor erred in holding that the juror Best was incompetent, on the ground that he was somewhat opposed to capital punishment, the said juror having been a member of the panel which at the present term has found Lewis Williams, one of the co-defendants, guilty of murder," &c. Our statute upon the subject makes the Circuit Judge the trier of the matter of fact whether a juror is indifferent in a cause. *State* v. *Dobson*, 16 S. C., 453, and *State* v. *Williams*, 31 *Id.*, 238. When the juror was asked whether he was opposed to capital punishment, he answered unequivocally that he was. We do not think that the judge committed error of law in rejecting the juror. In the case of *The People* v. *Damon* (13 Wend., 351) Chief Justice Savage said : "Such a juror is unfit; he has prejudged the question ; he has made up his verdict without hearing the evidence, and ought to be excluded on common law principles. It would be a solemn mockery to go through the form of a trial with such a jury, or even with one such juror. The prisoner is sure to be acquitted, independent of the question of guilt or innocence, It would be a misnomer to call such a proceeding a trial," &c.

II. "Because his honor erred in holding that the juror Woodham was incompetent, the said juror having answered, when examined on his *voir dire*, that he could find a verdict according to the law and the evidence." But the juror also said that he was on the jury which had just convicted Williams, and that in that case he discredited some of the witnesses, and if they were examined in the case of James, he would still discredit them, &c. The trial judge decided that the juror was not indifferent to the parties, and we cannot say that in so doing he committed error of law.

III. "Because his honor erred in holding that the juror Howle was competent, he having, when called to the book, expressed his belief in the guilt of the defendant," &c. The juror said that from what he had heard he thought the defendant guilty,

but, notwithstanding that, he could go upon the jury and render a fair and impartial judgment according to the law and the evidence. Upon that ground the judge ordered him to be presented, and we are unable to say that in doing so he committed error of law. It seems to us that the impression of the juror, based upon what he "had heard," was not more decided than that of the juror Toland in Coleman's case, who admitted that he had said "that a man committing so shocking a murder as this is reported to be, did not deserve a trial by jury." See *State* v. *Coleman*, 20 S. C., 450.

IV. "Because his honor erred in admitting in evidence the alleged conversations of the accomplice, Lewis Williams, with Daniel G. Harris and J. B. Howell, and that his honor's subsequent confession of his error and his attempted correction of the same did not undo the wrong of receiving it," &c. The declarations claimed to have been improperly admitted were made to the witnesses Harris and Howell by Lewis Williams, an accomplice, in 1886, before Joseph James was killed, but during the time when, as it seems, efforts were being made to take his life. When it is shown *prima facie* that parties are confederates in crime, the declaration of one in regard to the common design is admissible against all or either of the parties. Every act and declaration of each member of the confederacy, in pursuance of the original concocted plan, and in reference to the common object, is, in contemplation of law, the act and declaration of all. 1 *Greenl. Evid.*, § 111. The theory of the State was that the killing was done by three negroes, Williams, Arthur, and Scott, for a compensation promised them by the defendant, Joseph W. James, who was not to appear in the horrible business. In that case, the conspiracy being sufficiently shown, the declarations of each in regard to the common design were the joint declarations of all. But when the defendants were allowed to *sever* in their defences, it was not free from difficulty to determine what declarations of one of the confederates not on trial were admissible against another who was on trial. We have carefully read the testimony in question, and we are not entirely satisfied that in his first ruling—admitting the testimony—the judge committed error. But if so, the judge himself corrected

the error, reversed his ruling, and in effect struck the testimony
from the record, saying: "Yesterday, in admitting the testimony
of J. B. Howell and Daniel G. Harris as to declarations of Lewis
Williams, I thought in their testimony there was sufficient, with
reference to carrying out the conspiracy, to let the matter go
to the jury.   After having the stenographer to furnish the
testimony, and looking over it, I have concluded that I erred in
letting that testimony go before the jury, on the ground that it
does not appear to be *promotive of or in pursuance of* the con-
spiracy.   The jury will not therefore regard the declarations of
Lewis Williams in the conversations with Daniel G. Harris and
J. B. Howell referred to, as a part of the testimony in this case."
But it is urged that the testimony having been once heard by
the jury, possibly their minds had received impressions
which remained after the testimony was stricken from the
record; and that this possibility alone should entitle the
defendant to a new trial.   We know that the law is very tender
of human life, but considering the character of the testimony in
connection with the whole case, we cannot hold that the bare cir-
cumstance of the evidence having been heard by the jury, should
vitiate the whole proceeding.   The jury was instructed not to
consider it, and we must assume that they were what the law
directs, sensible, intelligent men, entirely without bias.   It is
true, there are extreme cases in some of our sister States, in
which the courts have gone very far in the direction indicated;
but there is no such case in this State.   As we think, the proper
rule in such cases is laid down in 2 Graham & Waterman on New
Trials, page 633 (2nd edit.), where, in commenting upon the
case of *Craddock* v. *Craddock*, the learned authors say: "But
so rigid a discipline would be injudicious.   It would doubtless
work more evil than it remedied.   A more moderate and less
exacting course has been found to answer every purpose.   In the
progress of a warmly contested suit, exceptionable testimony will
occasionally slip in, despite of the greatest care of the court and
counsel.   If, therefore, the bare circumstance that such evidence
had gone to the jury, vitiated all the proceedings, scarcely a ver-
dict in any case of importance would stand.   So that it is, on the
whole, the part of wisdom for courts, on motions for new trials,

to regard not so much the fact that improper evidence has been admitted, as the influence it may have had on the result. We may, then, lay it down as a settled rule, that if the verdict is undeniably correct, a new trial will not be granted, notwithstanding the admission of improper evidence"—citing cases from the States of New Jersey, Georgia, Mississippi, Arkansas, New York, and others.

V. "Because his honor erred in admitting the testimony of Eli Parrott to prove the acts of Robert Arthur, an alleged co-conspirator, after the consummation of the cospiracy." It seems that Robert Arthur, one of the alleged conspirators, disappeared from the country about the time the other parties were arrested. The witness Parrott was put upon the stand and asked the question whether "shortly after the arrest of Bill Scott and Lewis Williams, he saw Bob Arthur going in the direction of where young James was living, from his house, very early one morning." Counsel for the defendant objected. The judge ruled that he would permit testimony as to whether any one saw Bob Arthur after the killing as a substantive act. The defendant excepted. As we understand it, the rule is that after the common enterprise is at an end, the declarations of a conspirator is not admissible against his fellows, "when they are in the nature of *narratives, descriptions,* or *subsequent confessions.*" But that they are admissible "when they are either in themselves *acts,* or accompany and explain *acts,* for which the others are responsible." 1 Greenl. Evid., § 233. The judge admitted no testimony as to a confession of Scott, but a *substantive fact,* and we cannot say that in doing so he committed error of law.

VI. "Because his honor erred in excluding the testimony of Ed Sanders as to what old man James told the boy to do with the fish which James had purchased from the witness, holding that it was narrative," &c. It seems that one of the theories of the defence was, that the deceased met his death at the hands of Bill Scott and Lewis Williams, because they were jealous of him on account of his relations with their wives; and, in support of this view, they examined as a witness one Ed Sanders, who, in 1888, was a fish peddler in the country. He testified that on one occasion he sold four fish to the deceased

James, who presented two of them to an old lady, thinks Mrs. Atkinson. He gave the third fish to a little colored boy to be taken to a colored woman in the house, which was done, and the fourth fish he gave to another colored woman. Witness said: "Of course, I didn't know either of the women." The counsel for the defendant submitted that it was competent for the witness to state what the old man James said when he gave the fish to the little boy, on the ground that it was not narrative, but a verbal act. The judge refused to admit the testimony, and we cannot say it was error to do so. The whole case shows that the declarations of the deceased were in each instance ruled out, whether accompanying an act or not, except when in the presence of the conspirators or of the defendant.

VII. "Because his honor erred in refusing to require the witness J. J. Ward to disclose the version of the murder which he had received from the accomplice Scott in jail, holding that it was a privileged communication," &c. In order to understand this exception clearly, it will be necessary to make a short statement. The State called William Scott as an ordinary witness. The defendant's counsel objected to his competency, upon the ground that the witness had been previously convicted, sentenced, and punished in the penitentiary for "burglary and larceny;" and also upon the ground that this case for the murder of James was then open and pending against him. The production of the record in the burglary case was waived. The State in that case produced a pardon from his excellency the governor. The witness was then sworn and examined as to the time, manner, circumstances, and persons engaged in the killing, &c. Upon his cross-examination he stated that J. J. Ward, a lawyer at the bar, visited him in jail as his attorney in the case. He was then asked this question: "Did you in jail tell Mr. Ward that you knew nothing about the murder of old man James; that young Joe James never spoke to you about killing his father, and that all you had said about his hiring you to do it was false, and you said it because you were afraid; that the sheriff had threatened you, and drawn his pistol on you, or words to that effect?" To which the witness answered, "No, sir. He asked me did the sheriff draw a pistol on me, and I told him, 'No.' He

asked me did sheriff Cole draw a pistol on me, and I told him, 'No, sir.' "

. In making his defence, the defendant called to the stand as a witness, J. J. Ward, who testified as to other points, the object of his visit to Scott in jail, &c. He was then asked to state the account which Scott had given of the killing in that interview. The State objected that the witness could not disclose the professional communications which were made to him by his client. Mr. Ward said that he regarded all the talk he had with Scott on that occasion as matter confidential between them as attorney and client, except in so far as he thought he could use it to his benefit, &c. The judge asked the witness whether he was willing to disclose the communications Scott had made to him, to which he replied that "he was not, unless he was ordered to do so by the Court." By the Court: "The only point before me now is, can an attorney be compelled to disclose a communication between himself and his client? That is the point before me, and no court has, as I understand, gone to that extent; at least, no decision has been brought to my attention. I decline to compel the attorney, Mr. Ward, to disclose the communications between himself and Scott at the time indicated."

Was that error? It seems to us manifest that Mr. Ward, the attorney, knew nothing about the facts of the case as original matter, and was called only for the purpose of *contradicting Scott.* But without regarding this circumstance, the rule of evidence which holds as inviolable professional communications between attorney and client, is one of the most important, and in all forums must be maintained in all its integrity. Under the head of "Evidence excluded from public policy," Mr. Greenleaf says: "The rule is clear and well settled that the *confidential counsellor, solicitor, or attorney of the party* cannot be compelled to disclose papers delivered or communications made to him, or letters or entries made by him in that capacity. * * * The foundation of this rule is not on account of any particular importance which the law attributes to the business of legal professors, or any particular disposition to afford them protection; but it is out of regard to the interest of justice which cannot be upholden, and to the administration of justice, which cannot go on without the aid

of men skilled in jurisprudence, in the practice of the courts, and in those matters affecting rights and obligations which form the subject of judicial proceedings. * * * The great object of the rule seems plainly to require that the entire professional intercourse between client and attorney, whatever it may consist in, should be protected by profound secrecy." See 1 Greenl. Evid., §§ 237, 238, and 240.

But while the existence and importance of the rule are admitted, it is contended that the object of the rule was not to protect the attorney, but the client, who has the right to waive the protection given, and if he chooses to do so, the attorney is bound to make full disclosure. We incline to think that this unqualified view is not entirely consistent with the universally received doctrine that the rule is founded upon a wise *public policy*, reaching beyond the protection of the particular parties in the case and for the good of society, requiring that as to such communications the mouth of the attorney should be forever sealed. But if we assume that Scott had the right to waive his protection against disclosure by his attorney, did he do so? In section 500 of Wharton's Criminal Evidence, it is said that "while the privilege may be waived by the client, the evidence of the waiver *must be distinct and unequivacal.*" There was certainly no express waiver made by Scott. On the contrary, it is urged that by going on the stand himself. when called as an ordinary witness, he thereby "waived" his right of protection, not only as to himself, but also so far as his attorney was concerned. We do not see how that can be considered as "unequivocal" evidence of consent. "The fact that the client, being a party, testifies in his own behalf, is generally held not to be such a waiver of his privilege as to compel him to disclose such communications. But in Massachusetts it has been held that the party, if he takes the stand, waives the privilege so far as concerns himself and must testify, but he may object to having his counsel testify to such, even though he puts him on the stand himself." See Greenl. Evid., § 238, and notes; *Montgomery* v. *Pickering*, 116 Mass., 227; Weeks on Attorneys, § 117. We do not think there was error in declining to compel Mr. Ward, the attorney, to disclose

communications made to him in the course of consultation with Scott while he was his client.

The defendant, after an able and indefatigable defence, has been convicted the second time of the horrible crime with which he was charged. We are unable to discover in the record any such error of law as entitles him to a second trial, and therefore

The judgment of this court is, that the judgment of the Circuit Court be affirmed, and the case remanded to the Circuit Court for the purpose of enabling that court to assign a new day for the execution of the sentence heretofore pronounced.