JESSIE A. KNOWLTON, executrix, *vs.* THE FOURTH-ATLANTIC NATIONAL BANK OF BOSTON & others.

Suffolk.   January 17, 18, 1928.— June 28, 1928.

Present: RUGG, C.J., BRALEY, CROSBY, PIERCE, CARROLL, WAIT, & SANDERSON, JJ.

*Trust,* Existence of fiduciary relationship, Of personal property, Liability of trustee's agent. *Agency,* Liability of agent. *Equity Jurisdiction,* To enforce trust, Accounting. *Equity Pleading and Practice,* Premature suit; Bill; Master: change of finding. *Corporation,* Ultra vires. *Frauds, Statute of. Fraud. Mortgage,* Equitable. *Evidence,* Privileged. *Attorney at Law. Witness,* Privilege. *Practice, Civil,* Argument before full court. *Waiver. Contract,* Validity.

One, who was an expert in the growth and cultivation of gladioli bulbs and was in 1915 the owner of a considerable stock of them, was indebted to a bank.   It was orally agreed by the owner and the bank in July, 1915, that in a friendly action by the bank against the owner, his bulbs should be attached and sold on execution either to a certain nursery company or to an individual who was agent for such company; that the cultivation, harvesting and marketing of the bulbs, the expense of which the bank was to advance, was to be continued by the purchaser under the direction of the owner until the proceeds from sales of the bulbs should, directly or through the nursery company, liquidate the owner's debt to the bank and reimburse it for its advances under the agreement; that the bank was to advance to the

owner during the period of the agreement his living expenses; and that, when the bank had been paid and reimbursed, the remaining bulbs were to be returned to the owner. It was understood that it would take more than one year to carry out the agreement. Under the agreement, judgment was obtained by the bank against the owner, and the bulbs, after sale by the sheriff and purchase by the nursery company, were removed to the nursery company's premises late in 1915 and early in 1916. The owner worked at the nursery company from April to the end of 1916, during which time the bulbs were planted and cultivated under his direction, and he was paid his living expenses. At the end of 1916 he ceased to work at the nursery company and thereafter made no demand for further payments and none were made to him. The nursery company continued to cultivate the bulbs and made two payments to the bank. No bulbs were returned to the owner. In 1921 the owner brought a suit in equity against the bank, the nursery company and its agent, seeking relief against the nursery company and its agent only. The bill sought an adjudging of the existence of a trust, an accounting, a return of the remaining bulbs, and a payment by the nursery company and its agent to the bank of whatever was due it. The bill did not allege improper commingling of the receipts from sales of bulbs by the nursery company. The bank in its answer admitted that the plaintiff had demanded an accounting and that it had "denied his right to an accounting"; and alleged that the plaintiff's debt was not wholly paid and that the proceeds from the sale of the bulbs were not sufficient to pay the account due it. It was found by a master that no segregation as to the plaintiff's bulbs was made in the nursery company's accounts; that neither the nursery company nor its agent was a party to the agreement with the plaintiff; and that those defendants acted throughout the transactions as agents for the bank. *Held,* that

(1) Relief based upon the ground of improper commingling of the receipts from sales of bulbs by the nursery company was not within the scope of the bill;

(2) The defendants other than the bank were accountable only to the bank and the bill should be dismissed as to them;

(3) The bank held legal title to the bulbs upon a trust to liquidate the plaintiff's debt, reimburse itself for advances made, and to return the surplus bulbs and proceeds of their sale to the plaintiff;

(4) In view of the refusal by the bank to account, a contention by it that the suit was premature was not tenable;

(5) The agreement was not *ultra vires* the bank;

(6) The agreement constituted an equitable mortgage of the plaintiff's bulbs, and the statute of frauds was no defence to the plaintiff's right to an accounting;

(7) Relief against the bank by way of an accounting might be granted.

Matters not dealt with by a party in his brief or argument before this court must be deemed to be waived by him.

The master in the suit above described found that the plan arranged by the plaintiff and the bank was explained to two of the plaintiff's larger creditors and their approval obtained. There was no evidence that it was submitted to the plaintiff's other and smaller creditors, nor that they

were pressing him for payment. The master found that neither the plaintiff nor the bank intended to hinder, delay or defraud other creditors of the plaintiff, but that both were animated by proper motives. It *was stated* that the master's finding that there was no fraud on other creditors could not be said to be erroneous; and that the agreement was valid between the plaintiff and the bank.

The plaintiff had a conference with the president of the bank at which the plan subsequently agreed upon and above described was discussed. The plaintiff testified before the master that, after such conference, he had a conference with his attorney, in which he told his attorney of the previous conference. The attorney was called as a witness and was asked by the defendants, "Did . . . [the plaintiff] tell you that he had entered into an agreement with . . . [the president of the bank], or . . . [the president] with him that the suit was to be a friendly suit, and that the bank was to buy in the bulbs and cultivate them for the benefit of . . . [the plaintiff]?" The attorney claimed privilege and declined to answer the question. Upon certification of such question by the master to a judge of the Superior Court, it was ruled that there had been no waiver of the plaintiff's privilege and that the attorney should not be compelled to answer the question. The defendants excepted and offered to prove that the attorney's answer would have been in the negative. *Held,* that the ruling was erroneous and that the defendant's exception must be sustained.

In his report in the suit above described, the master found the value of the plaintiff's bulbs at the time they were removed to the nursery company's premises, but not at the time of the filing of the bill, and found that their number decreased constantly up to 1921; that, although it was difficult to account for the decrease except upon the theory of some careless or improper handling or cultivation, he could not "from the evidence specify its nature"; that the bulbs were planted and cultivated by the nursery company in the years subsequent to 1916 in the usual manner which was on the whole reasonable; and that there was a scarcity of labor during those years. The suit was ordered recommitted to the master to find the value of the bulbs at the time of the filing of the bill, which he was directed to substitute for the value previously found. The master thereafter filed a supplemental report stating the value of the bulbs at the time the bill was filed, which was less than that previously found, and stating an account, based on that value, on gross sales and sundry items of expense charged against the plaintiff in the cultivation and sale of the bulbs by the nursery company. No evidence was reported. An interlocutory decree was entered overruling the plaintiff's exceptions to the supplemental account. *Held,* that

(1) Nothing appeared which required a reversal of the master's second finding as to the value of the bulbs;

(2) The items of expense in the account stated appeared to be reasonable and proper on the facts found;

(3) The interlocutory decree must be affirmed.

BILL IN EQUITY, filed in the Superior Court on October 31, 1921, by Montague Chamberlain and, after his death, prose-

cuted by the executrix of his will, against The Fourth-Atlantic National Bank of Boston, Charles H. Breck, Breck-Robinson Nursery Company, and Joseph Breck and Sons Corporation.

The bill and the defendants' answers are described in the opinion. The bill contained no specific prayer for relief against the defendant The Fourth-Atlantic National Bank of Boston. A supplemental bill was filed June 13, 1924.

The suit was referred to a master, material facts found by whom are stated in the opinion. During the hearing, the master made the following certification:

"1. The defendants called as a witness on May 14, 1923, the Hon. James A. Bailey, formerly employed as counsel by the plaintiff in the action at law referred to in the plaintiff's bill in this case and made the basis of the present suit. The plaintiff Chamberlain previously had testified on his own behalf as to a conversation had between himself and Mr. Hallett, president of the defendant bank, in which the agreement now sued upon was, as he claimed, entered into. The making of this agreement is denied by the defendants and the existence of the agreement is one of the important issues in the case. Said Chamberlain testified on cross-examination that he informed said Bailey his attorney as to the agreement entered into with said Hallett. For the purpose of denying this and thereby affecting the credibility of said Chamberlain, counsel for the defendants on May 14, 1923, asked said James A. Bailey the following question: 'Q. Did Mr. Chamberlain tell you that he had entered into an agreement with Mr. Hallett representing The Fourth-Atlantic National Bank, or Mr. Hallett with him that the suit was to be a friendly suit, and that the bank was to buy in the bulbs and cultivate them for the benefit of Mr. Chamberlain?'

"The question was objected to by counsel for said Chamberlain among other grounds because any talk between Mr. Chamberlain and Mr. Bailey was a privileged communication between counsel and client. After some discussion I ruled *de bene* that the question was competent. The witness Bailey then stated: 'I am an attorney at law and was attorney for Mr. Chamberlain for a long time. I take it I have the right to claim privileged communications between Mr. Chamber-

lain and myself and only the court can order me to testify. I respect the relation of attorney and client and therefore claim the privilege, unless the representative of Mr. Chamberlain opens my mouth and waives that right.'

"Counsel for Mr. Chamberlain did not waive his privilege.

"I ruled that there was no privilege. I at first ruled this *de bene,* but have since ruled that the rule as to privilege does not apply and the question asked is competent and should be answered.

"Wherefore I request this honorable court to order the said James A. Bailey to answer said question and other questions of the same nature tending to affect the credibility of said Chamberlain."

This matter was heard by *McLaughlin,* J., who ruled: "I am of the opinion that there has been no waiver of the plaintiff's privileges and that Mr. Bailey should not be ordered to answer the question."

The master thereupon ruled that, "In view of the memorandum decision of Mr. Justice McLaughlin I therefore reverse the ruling heretofore made by me in respect to the said matter and do not permit the witness to reply to the questions propounded by Mr. Bailey, ruling that the questions are incompetent and the answers therefore inadmissible because of the privilege of counsel. And . . . counsel for the defendants . . . save their exceptions and ask that the matter be reported."

The defendants saved an exception and offered to prove that Mr. Bailey's answer would have been in the negative.

After the master's report was filed, the suit, upon motion by certain defendants, was recommitted to the master by order of *Hammond,* J., and the master thereupon filed a supplemental report.

Upon exceptions to the master's supplemental report, an order was made by *McLaughlin,* J., in part as follows:

"As to the manner of stating the account: in dealing with this aspect of the case, the master places the value of the Chamberlain bulbs when they were transferred to the Breck-Robinson Nursery at Lexington, late in 1915 or early in 1916, in the sum of $20,000, finds that from that time to January,

1921, and, as I assume, to October 31 of that year, the day on which the bill was filed, their number constantly decreased, and that in consequence the original value was very materially less in 1921 than when the plants were taken over by the Breck-Robinson Nursery Company. He does not, however, state their value as of 1921. He credits the plaintiff and conversely charges the defendants with this loss, placing the responsibility for the decrease in the number of the bulbs upon the Breck-Robinson Nursery Company, and the theory upon which he fixes responsibility is stated in the twenty-sixth paragraph of his report, where he says:

" 'I find that in the subsequent seasons the Nursery planted and cultivated the bulbs in the usual manner which, on the whole, I find to be reasonable. There is no evidence from which I can ascertain the number of bulbs harvested in the fall of 1916, nor the number planted and harvested in each of the succeeding years. It does appear, however, that the number of bulbs constantly decreased until, according to an inventory of January, 1921, there were only 135,000 of the first, second and third sizes and 600,000 bulblets. The evidence does not account for this shrinkage either by sales or by adverse soil and weather conditions. Having in mind the evidence of the natural accretion of bulbs while being grown by Chamberlain himself and the experience of others, I find it difficult to account for the large decrease in bulbs except upon the theory that there was some careless or improper handling or cultivation, but I cannot from the evidence specify its nature.' . . .

"Having in mind the specific finding of the master in the same paragraph of his report, that in the years subsequent to 1916, when the bulbs were set first out in the Breck-Robinson Nursery Company's land at Lexington, they were planted and cultivated in the usual manner, which on the whole he finds reasonable; the scarcity of labor during the years in question; the uncertainty incident as matter of common knowledge to the raising of plants which grow from bulbous roots; the absence of any finding that the nursery's own bulbs did not diminish in number, and the fact that in 1916 Chamberlain ceased to exercise any supervision over their

cultivation, thus withdrawing the benefit of his advice and experience . . . I am of opinion that it is not reasonable to infer from the facts reported that the decrease in the quantity of bulbs was due to careless or improper handling or cultivation. For this and for other reasons hereinafter stated, the report is recommitted and the master is directed to find the fair value of the bulbs as of the time when the bill was filed, viz. October 31, 1921, and to substitute such sum in place of the credit of $20,000 appearing in the partial account which he has submitted."

The order also directed the master to state the account as against the defendant bank, and overruled certain exceptions by the defendants to the master's reports.

The master thereafter filed a second supplemental report, in which he found the value of the bulbs on October 31, 1921, to be $11,451.96, and stated an account, material portions of which are set forth in the opinion. Exceptions to the master's second supplemental report were ordered overruled by *McLaughlin*, J., who reported the suit for determination by this court upon the pleadings, the three reports by the master, objections and exceptions to the reports, and the several orders and interlocutory decrees thereon. No evidence was reported.

The case was argued at the bar in January, 1928, before *Rugg*, C.J., *Braley, Pierce, Carroll,* & *Sanderson,* JJ., and afterwards was submitted on briefs to all the Justices.

*R. B. Owen,* (*E. R. Anderson* with him,) for the plaintiff.

*H. R. Bailey,* (*E. B. Church* with him,) for the defendant The Fourth-Atlantic National Bank of Boston.

*M. F. Weston,* for the defendants Breck and others.

PIERCE, J. The original plaintiff, now deceased, in substance alleges in his bill that in September, 1915, he was the owner of upwards of four million gladioli bulbs of great value; that if they were properly grown and intelligently handled they should have sold at that time at a fair sale for more that $20,000; that under proper handling, growing and harvesting they should have multiplied so that at the time of the filing of the bill (October 31, 1921) if no part of the

original stock had been sold, there should have been on hand at least seven million bulbs of all varieties.

The bill further states, in substance, that in December, 1915, the plaintiff was indebted to the defendant, the Fourth-Atlantic National Bank; that in that month the bank made a demand upon him for the sum due, about $2,000; that the bank and the plaintiff then made an agreement by which the bank was to bring a friendly action at law based on the indebtedness of the plaintiff to the bank, which the plaintiff would not contest; that by the terms of the agreement the sheriff was to seize the gladioli bulbs on execution and sell them at auction to the bank or its agent, the defendant Breck; the agent was to take the bulbs, have them properly cultivated at his nurseries, sell and dispose of the surplus or increase in the bulbs for the benefit of the bank; and the bank would advance money to the plaintiff to harvest and care for the bulbs and would make to the plaintiff for three years an allowance of money sufficient to give him a comfortable living; and the agent would return the bulbs to the plaintiff after the bank had received payment of its loan, and interest. It is further alleged that the friendly suit was brought, and the sheriff seized the bulbs and in due time sold them on execution to the defendant Breck for a sum far below their actual value; that the agreement has not been complied with by the bank or by the agents of the bank; and that certain false representations were made by the defendant Breck which induced the plaintiff to execute a bill of sale of a portion of the bulbs.

The plaintiff prays for an injunction; for the declaration of a trust; that Breck, the Breck corporation and the nursery company be compelled to account; for an order that the defendant Breck pay to the bank the amount due the bank as of January 1, 1919; and for a return of the remaining bulbs.

The answers of the four defendants embrace the defences of laches, *ultra vires*, statute of frauds, *res judicata*, and that the alleged agreement was in fraud of other creditors of the plaintiff. A supplemental bill was filed June 13, 1924, to cover the period from October 31, 1921, to that date. Noth-

ing further about this supplemental bill appears in the record and it is deemed to be waived.

The case was referred to a master who filed a report on July 5, 1924, and two supplemental reports; such exceptions as were taken thereto were overruled and the reports were confirmed. On January 18, 1926, two interlocutory decrees were entered. The first ordered a recommittal for a corrected statement of the account against the defendant bank, in accordance with the rulings set forth in the order on exceptions to the master's report, and a direction to the master that interest may be added on the balance in whosesoever favor it may be from the date of the filing of the bill to the date of the filing of the report.

The material facts found by the master are in substance as follows: The plaintiff, who was an expert in the growth and cultivation of gladioli bulbs, in 1915 had accumulated a considerable stock of them. The Fourth-Atlantic National Bank was authorized to operate a general banking business in Boston in accordance with the banking laws of the United States; it held a note of the plaintiff for $1,800, which, when it became due on May 15, 1915, the plaintiff was unable to pay. Other creditors of the plaintiff were L. P. Hollander and Company for $1,500, John C. Paige and Company for $325, and several farmers for an aggregate of $650. His assets consisted of a horse, a carriage, garden equipment and the bulbs. The fair value of the bulbs was $20,000 although this amount could not have been obtained on a bulk sale. As a result of conferences with the defendant bank concerning his financial condition, an oral contract was entered into on some day between July 14, 1915, and July 20, 1915, by the plaintiff and the defendant Breck acting as the agent of the bank, as follows: "The bank was to cause a friendly suit to be brought against Chamberlain on his note held by the bank, which suit was not to be contested; an attachment of the growing crop of bulbs at Wellesley was to be made on the writ; pending a sale of the bulbs on the execution Chamberlain was to be kept in charge of the bulbs and their cultivation and harvesting, under the sheriff, the bank advancing the costs of cultivation and harvesting including Chamber-

lain's living expenses and rent of the farm; after the bulbs were harvested they were to be sold on execution and were to be purchased by Breck or one of his companies for him, as agent for the bank, and the purchaser was to continue the planting, cultivation, harvesting and marketing of the bulbs under Chamberlain's direction until such time as the proceeds from the sale of the bulbs should liquidate the debt to the bank and reimburse it for such advances as it, directly or through Breck and his companies, might have made on account of the plan. When the bank had been paid and reimbursed, the bulbs remaining were to go back to Chamberlain. Chamberlain was to be given, during the time necessary to liquidate the debt and advances, compensation at such rate as should be necessary for his living expenses. No amount was fixed for this item at the time the contract was made . . . [$18 per week was later fixed as the amount]. There was no time fixed as to the duration of this arrangement, but it was understood that it would take more than one year and probably three to liquidate the debt and advances to be made."

The defendant Breck corporation was not a party to the agreement between Chamberlain and the bank, either as principal or as agent, and did not act as such in its performance. The nursery company was not a party to this agreement; it acted as agent for the bank in planting, cultivating, harvesting, advertising and selling the bulbs with Chamberlain's assent. Breck was not, as an individual, a party to this agreement; he acted at all times either as the agent for the bank or for the nursery company in its capacity as agent for the bank.

It did not appear that any endeavor was made to join the other creditors of Chamberlain in the plan. It was, however, explained to the Hollander and Paige companies and their approvals obtained. There was no evidence that the plaintiff submitted the plan to his other small creditors, nor does it appear that they were pressing him for payment. Neither the plaintiff nor the bank intended to hinder, delay, or defraud the other creditors, but on the contrary both were animated by proper motives.

In pursuance of the agreement the suit was brought and the bulbs were attached. Judgment was entered on December 27, 1915, with the consent of the plaintiff's counsel. After the attachment the plaintiff was nominally in charge for the sheriff. With the assistance of an employee furnished by the nursery company the plaintiff continued to cultivate the bulbs and later harvested them in the usual manner and stored them. Sometime about November 20, the nursery company sent to Wellesley and took away a substantial portion of the bulbs to its nursery in Lexington; and again, on December 10 and 13, more bulbs were taken to Lexington. The sheriff's return charges him with the sale of bulbs aggregating $1,956.39. There was no evidence that Breck or the nursery company paid the sheriff any money for these bulbs; and no evidence of any other bulbs being similarly disposed of. Sometime after the first lot had gone to Lexington the plaintiff, at the request of Breck, signed an agreement which had been prepared by the bank's attorney, giving the sheriff permission to sell eight hundred and ten thousand bulbs to the nursery company for the sum of $1,290.41. Breck explained the necessity for this agreement to be that the attorney feared that the act of the sheriff in letting the bulbs go might affect the validity of the attachment and this agreement would protect the sheriff. This agreement was in furtherance of the plan under which the parties were acting and the representations made by Breck to the plaintiff in respect thereto were made in good faith. The remaining bulbs were sold on January 6, 1916, at an auction conducted by the sheriff. Breck, acting for the bank, purchased them for $750.

Shortly after the auction the plaintiff went to work regularly at the nursery of the Breck-Robinson Nursery Company in Lexington. From April, 1916, until the end of 1916, when he ceased to work at Lexington, he was paid $18 a week; after this date he made no demand for further payments and none were made to him.

The planting season of 1916 was delayed by reason of cold weather and the scarcity of labor. During the last part of May and the first part of June the bulbs were all planted

under Chamberlain's supervision.  The planting was done on land generally suitable for gladioli culture and in the main satisfactory to Chamberlain, with the possible exception of about an acre in which the bulblets were planted; of the propriety of this plot he had some doubt.  This land turned out not to be good for the bulblets.

In 1916 and in subsequent seasons the number of bulbs constantly decreased.  The evidence did not account for this shrinkage either by sales or by adverse soil and weather conditions.  The master states that it is difficult to account for the large decrease in bulbs except upon the theory that there was some careless or improper handling or cultivation, but it is impossible on the evidence to specify its nature.

January 17, 1916, the nursery company paid $500 to the bank on the plaintiff's debt.  This sum came from proceeds of the gladioli business and was credited by the bank on the note which represented this debt.  On May 31, 1917, the nursery company made an additional payment of $500 to the bank.  The bank received no other money.  The full amount of this last payment was not credited to the note but $300 which the bank had paid to its attorney, Mr. Smith, in the proceeding against the plaintiff was deducted from it. There was no agreement that this deduction should be made, unless the payment to its attorney be considered as one of the expenses incidental to the carrying out of the agreement. Together with the sum which the sheriff had credited on the execution these two payments more than equalled the judgment debt from Chamberlain to the bank by $451.44, if the payment of the $300 to Mr. Smith is disregarded.

At the time the Chamberlain bulbs were taken to Lexington the nursery company had about thirty thousand bulbs of its own.  These bulbs were not planted with the plaintiff's bulbs, but no attempt was made in the accounts to segregate the cost of planting and cultivating or the receipts from their sale.  All these items were grouped together in the "Gladioli Account."  The master states that it is not possible to separate the sales; that at the end of 1920, by direction of Breck, the "Gladioli Account" was closed, and from that time there is no account which deals with these bulbs in such

manner as to allow any identification or analysis either of expenditure or receipts.

It is plain on all the reported facts and on the special findings of the master that the defendant Joseph Breck and Sons Corporation "was not a party to the agreement between Chamberlain and the Bank, either as principal or as agent, and that it did not act as a party in its performance"; that the defendant Charles H. Breck was not as an individual a party to the agreement between Chamberlain and the bank, and that he acted at all times either as the agent for the bank or for the Breck-Robinson Nursery Company in its capacity as agent for the bank; and "that the [defendant] Breck-Robinson Nursery Company was not party to the agreement between Chamberlain and the Bank, and that it acted as agent for the Bank in planting, cultivating, harvesting, advertising and selling the bulbs with Chamberlain's assent."

The bill does not allege the improper commingling of the receipts of the sale of bulbs by the nursery company. *People's National Bank* v. *Mulholland,* 228 Mass. 152. It follows that relief based upon this conduct is not within the scope of the bill. *Gamwell* v. *Bigley,* 253 Mass. 378, 380. *Boothby* v. *Dezotell,* 256 Mass. 250, 255. *Thayer* v. *Atwood,* 259 Mass. 523.

There are no special circumstances to take the case out of the general rule that an agent employed by a trustee is accountable only to the trustee who employed him, and that he cannot be considered a constructive trustee and held liable merely because he knew of the trusts. *Archer* v. *Lavender,* Ir. R. 9 Eq. 220, 225. *Dove* v. *Everard,* 1 Russ. & My. 231. *Attorney General* v. *Chesterfield,* 18 Beav. 596. *Lockwood* v. *Abdy,* 14 Sim. 437, 441. In this case there are no facts to warrant a finding that the defendants, with the exception of the bank, or any of them received the bulbs in a capacity other than as agent of the bank or that any of them has been guilty of corruption countenanced by the bank, or in concert with the bank has made a fraudulent misuse of the bulbs or of a misapplication of the money received from the sale of the bulbs. It follows that the general rule is to be applied as respects all the defendants apart from the bank;

and that as to each of them the bill is to be dismissed with costs.

The report of the master establishes that the defendant bank held the legal title to the bulbs upon a trust for the purpose of liquidating the debt of the plaintiff to it, of reimbursing itself for the expenses of the plan, and of eventually returning the bulbs unsold and any surplus money realized from the sale of bulbs. In its answer the bank admitted "that the plaintiff has demanded an accounting and that it . . . has denied his right to an accounting." This denial, as disclosed in the brief of the bank, was based upon the claim that the suit was premature in that the plaintiff was not entitled to have the unsold bulbs returned to him until he should pay his debt to the bank; that he has not paid the debt; that over $1,800 is still unpaid; and that the proceeds of the bulbs sold were not sufficient to pay the expenses of cultivation and selling and the amount due the bank. We think the bill for an accounting was not premature in the circumstances here disclosed showing a repudiation of the agreement by the Breck-Robinson Nursery Company in 1921, and the refusal of the bank on demand to make an accounting. *Condit* v. *Maxwell*, 142 Mo. 266, 276.

The bank set up in its answer and argues in its brief that the agreement was *ultra vires*. The bank had the power to loan money and as necessarily incidental thereto it had the right to take security therefor. *First National Bank of Grand Forks* v. *Anderson*, 172 U. S. 573.

The bank sets up in its answer and relies in its brief upon the defence of the statute of frauds, in that the agreement was not intended to be performed within one year. The agreement here constituted an equitable mortgage, and the statute of frauds is not a defence to the right of the plaintiff to have an accounting. *Potter* v. *Kimball*, 186 Mass. 120, 122. *O'Brien* v. *Hovey*, 239 Mass. 37, 43.

The defendant bank set up in its answer that the agreement was in fraud of creditors. It does not treat of this alleged defence in its brief, and on familiar ground it is deemed to have waived it. Disregarding the waiver, the agreement was valid between the parties to it. *Pollock* v.

*Pollock,* 223 Mass. 382. As to creditors, such an agreement ordinarily would present a question of fact and not one of law. *Rawson* v. *Plaisted,* 151 Mass. 71, 72. *Samuels* v. *Charles E. Fogg Co.* 258 Mass. 402. *Banca Italiana Di Sconto* v. *Bailey,* 260 Mass. 151. In the case at bar the finding of the master that there was no fraud cannot be said as a matter of law to be erroneous. As the bank points out the bill does not allege any breach of trust on the part of the bank and does not pray for any specific relief against the bank; but this is not necessary. G. L. c. 214, § 12. *Kilkus* v. *Shakman,* 254 Mass. 274, 279. A decree for an accounting may be had under a prayer for general relief. *Watts* v. *Waddle,* 6 Pet. 389.

Founded upon objections to the master's final report, the bank on July 8, 1924, filed the following exceptions:

"1. This defendant duly requested the master to insert at the end of paragraph 14 of his report the words 'The agreement with Chamberlain was finally made in July 1915.

"'It was a part of the agreement that the bulbs should be planted and cultivated and harvested during the summer and fall of the year 1916.'

"The master has failed to comply with this request although the statements asked for were statements as to important, if not vital issues raised by the pleadings and were statements fully warranted by the evidence in the case.

"2. This defendant duly asked the witness J. A. Bailey, Esq., what his client said to him about any agreement between himself and Mr. Hallett the president of the bank. The master finally ruled that the question was incompetent and need not be answered.

"An offer of proof was then duly made that the witness J. A. Bailey if required to answer would testify that his client Chamberlain never told him of such an agreement. This testimony would have contradicted the testimony of Mr. Chamberlain on a very vital point."

These exceptions were overruled by an interlocutory decree, filed January 18, 1926, and the bank appealed therefrom on January 23, 1926. In its brief the defendant deals only with the exception numbered "2" and is therefore

taken to have waived its appeal from the interlocutory decree overruling the exception numbered "1."

The record discloses that, after Chamberlain had testified on cross-examination that he told his counsel, James A. Bailey, Jr., of his conversation with Hallett, the president of the bank, being the conversation which was the basis of the agreement, Mr. Bailey, called as a witness for the defendants, was asked by counsel for the bank: "Did Mr. Chamberlain tell you that he had entered into an agreement with Mr. Hallett . . . that the suit was to be a friendly suit, and that the bank was to buy in the bulbs and cultivate them for the benefit of Mr. Chamberlain?" This question was excluded, and the bank made the offer of proof, namely, that the witness if required to answer would testify that Chamberlain never did tell him the things contained in the defendant's question, that is, that his answer would be "No." It is said in *Woburn* v. *Henshaw*, 101 Mass. 193, at page 200: "The policy of the law will not allow the counsel himself to make disclosures of confidential communications from his client; but if the client sees fit to be a witness, he makes himself liable to full cross-examination like any other witness"; and it was said in *Gossman* v. *Rosenberg*, 237 Mass. 122, at page 124, "a voluntary witness waives every personal privilege." The privilege against the disclosure of confidential communications between attorney and client is personal to the client and may be waived by him. *Phillips* v. *Chase*, 201 Mass. 444, 450. See *Montgomery* v. *Pickering*, 116 Mass. 227; *McCooe* v. *Dighton, Somerset, & Swansea Street Railway*, 173 Mass. 117. The evidence was admissible. The exception argued must be sustained.

On January 18, 1926, on motion to confirm the master's report, it was ordered, adjudged and decreed "That the master's report be recommitted upon the question of the statement of the account as against the defendant the Fourth Atlantic National Bank, and the master is directed to state the account in accordance with the rulings set forth in the order on exceptions to master's report." The bank took no appeal from the interlocutory decree ordering a recommittal for the statement of the account against the bank. In this

supplemental report the master finds, without a report of the evidence, that the value of the bulbs when the bill was filed was $11,451.96; that the gross sales amounted to $15,379.38, a total of $26,831.34; and that the expense of cultivating and selling bulbs was $17,031.78, including judgment on the note as of December 27, 1915, and interest on judgment to October 31, 1921. That is to say the gross sales did not amount to enough to pay the note, interest and expenses of cultivation. The shortage was $1,652.40. Deducting this shortage from the value of the bulbs on hand left the plaintiff entitled to receive $9,799.56 on October 31, 1921, when the bill was filed.

The brief for the bank contains no discussion or objection to any item of the account as stated by the master. As against the bank that account must stand if it be warranted in any aspect of the facts found. The finding of the master that the value of the bulbs should be taken as of October 31, 1921, and not of the spring of 1916 as he found in his first report, is based upon a ruling of the judge "that it is not reasonable to infer from the facts reported that the decrease in the quantity of bulbs [between the spring of 1916 and January 1921] was due to careless or improper handling or cultivation." It was of course reasonable for the master to change his finding in this regard if upon further consideration he concluded the first valuation was not warranted by the facts. The evidence is not reported, and aside from the findings of the master in the first report, which are withdrawn, there are no facts found requiring a reversal of the finding in his second supplemental report that establishes the value of the bulbs to be $11,451.96 instead of the first finding of $20,000. The bank does not in terms present any objections to the item of gross sales nor does it contend that the items and sums credited the account are inaccurate in description or less in amount or value than they should be.

The objections of the plaintiff to the master's second supplemental report, which were overruled by an interlocutory decree of November 8, 1926, and which are before this court on appeal of the plaintiff, are as follows:

"(1) Objection is made to Paragraph 4 in the master's

second supplemental report in so far as the master finds that three thousand and seventy-five dollars and eighty-seven cents ($3,075.87) is a reasonable compensation to the nursery for its services in selling the bulbs, it appearing in the said paragraph of the report that there is no evidence as to what the fair value of said services was.

"(2) The plaintiff objects to the inclusion of the following amounts in the account stated in paragraph 4 of the master's second supplemental report, said amounts appearing as credits to the accountant.

"(a)  Value of services of Curtis N. Smith           $300.00
  (b)  Advertising as per par. 32 of report             87.67
  (c)  Catalogues, printing, mailing, etc., as per
         par. 32 of report                             198.00
  (d)  Use of land as per agreement                    623.00
  (e)  General Management as per par. 34 of
         report                                        820.00
  (f)  Clerical expense as per par. 35 of report       380.00
  (g)  Fertilizer as per par. 36 of report           1,200.00
  (h)  Heating as per par. 38 of report                174.00

"The plaintiff objects to these items on the ground that said charges are not in accordance with the contract between Chamberlain and the defendants, and on the additional ground that there is no evidence on the basis of which said amounts can be allowed as appears from the face of the master's report."

The allowance and computation are supported by the facts found.   The credit of $3,075.87 with the approval of a judge of the Superior Court was found by the master to be a reasonable commission on the gross sales as compensation for the services in selling.   Item (a), the Smith fee of $300, was found to be a reasonable fee for the services rendered by him in bringing the action and putting through the legal details of the plan.   Items (b) and (c), for advertising, catalogues, printing, mailing, etc., are divided, and, totaled in the first account stated by the master and in the reported facts, would seem to have been proper expenditures in the prosecution of the business and equitable in amount.   Item (d), for the use of the land, was properly allowed by the master; the

value of such use was agreed upon by the parties.    Items (e) and (f), charges for general management from 1916 to 1920 inclusive and for clerical service, were arrived at by determining a proper proportionment which should be allowed and credited for such services, to be ascertained from the proportion the gladioli sales bore to the total sales of the Breck-Robinson Nursery Company; although difficult to determine absolutely, the method used seems to be a reasonable one. Items (g) and (h), for fertilizer and heating, are manifestly proper charges for expense, and in the absence of the evidence cannot be found to be wrong.

The interlocutory decree overruling the exceptions of all parties and confirming the report is affirmed except as to the defendants' exception numbered 2, and as to that exception the decree is reversed.    It results that the bill is to be dismissed with costs as to all defendants other than the Fourth-Atlantic National Bank.    As to that defendant the case is to be remanded to the Superior Court for further proceedings not inconsistent with this opinion.

*Decree accordingly.*