## CLEAVES v. KENNEY.
### No. 2764.

Circuit Court of Appeals, First Circuit.
Feb. 18, 1933.

MORTON, Circuit Judge, dissenting.

---

Frederick H. Tarr, of Boston, Mass., for appellant.

Lothrop Withington, of Boston, Mass. (Arthur M. Beale, of Boston, Mass., on the brief), for appellee.

Before BINGHAM, WILSON, and MORTON, Circuit Judges.

WILSON, Circuit Judge.

This is an appeal from a judgment of the District Court of Massachusetts in an action at law to recover damages for an alleged breach of a contract to destroy a will in order that the appellee might inherit the entire estate of the testatrix, Ada M. Perry.

The appellee was the niece of Mrs. Perry, and formerly resided in Kansas with her father and mother, who was a sister of Mrs. Perry.

Mrs. Perry was first strongly attracted to the appellee, then Viola Riggs, on a visit to her parents in 1910. In 1912, following the graduation of the appellee from high school, Mrs. Perry urged her niece to come East with her. In 1919 the appellee visited her aunt at Rockport, Mass., during which visit Mrs. Perry suggested that, if the appellee would stay with her, she (Mrs. Perry), would provide that at her death the bulk of her estate should go to the appellee.

In 1920, at Mrs. Perry's invitation, the appellee and her father and mother spent the winter with Mrs. Perry, and during this time Mrs. Perry made a will in favor of the appellee. In the spring of 1921 the appellee and her father and mother returned to Kansas, where her father died in 1923.

Again Mrs. Perry urged her niece to come and live with her, but, as she was then married and her mother ill, she refused. In April, 1925, the appellee's mother having died, Mrs. Perry again urged the appellee and her husband to come and live with her, and wrote Mr. Kenney, addressing him as her "Dear Son," and saying: "What I have will be for you and Vi, except which I want for my own comfort," and signing herself, "Mother."

Soon after receiving this letter, the appellee and her husband wound up their affairs in Kansas and came to Rockport to live with Mrs. Perry, and in October, 1925, Mrs. Perry made a new will, giving to her niece all her property, excepting a few small bequests, and with Mr. Kenney's consent, by legal proceedings, adopted her niece as her own daughter.

During the two following years Mr. Kenney accepted a position in the Department of Justice and was assigned to Florida, and later to Mississippi. Mrs. Kenney and Mrs. Perry spent some of the time in Massachusetts and some of the time in the South with Mr. Kenney.

Perhaps indicative of her advancing years, Mrs. Perry experienced many changes of mind as to their place of abode and the disposition of the property, though her fondness for her niece does not seem to have abated. Her letters during all this period contained many expressions of affection for both Mrs. Kenney and her husband, and of the hope that arrangements could be made that they might all live together.

Steps were taken in 1927 to secure Mr. Kenney's transfer to Massachusetts. At this time Mrs. Perry suggested that she would put her real estate in the joint names of herself and the appellee, but, before it was accomplished, again changed her mind.

Feeling that Mrs. Perry might never, owing to her changeableness of mind, carry out her expressed intent of leaving her entire property to the appellee, Mr. Kenney canceled his plans to come to Massachusetts, and Mrs. Kenney went to Pennsylvania to earn money, both having apparently given up hope at this time of receiving any competence from the adoptive mother.

Mrs. Perry, however, was not content, and again besought Mrs. Kenney to come back to her, and stating she would immediately on her arrival deed her house to her, and wrote Mr. Kenney, urging him to prevail on her "dear daughter," as she termed her, to return to her, saying:

"I want you and Vi to have all I have and I know you will not get it if I do not have things fixed so that they will be yours. Send my dear daughter to me."

In response to this request, and relying on these assurances, Mrs. Kenney again returned to Rockport to live, and in October, 1927, a deed of Mrs. Perry's real estate in Rockport and in Boston, and constituting the bulk of her property, was executed, conveying to Mrs. Perry and Mrs. Kenney the property as joint tenants.

From this time until September, 1928, Mrs. Kenney lived at Rockport, except for occasional visits with her husband in Florida. During the spring or summer of 1928, other more remote relatives and friends apparently created in Mrs. Perry's mind dissatisfaction with the then conditions.

As a result, Mrs. Perry in June, 1928, requested that Mrs. Kenney reconvey the real estate recently conveyed to her as joint tenant. In connection with this request, the appellee testified in substance that, when Mrs. Perry demanded a reconveyance of the real estate and there was talk of calling her counsel in, Mrs. Kenney said to her that, if her (Mrs. Perry's) attorney should say, as Mrs. Kenney believed he would, that Mrs. Perry had no legal right to compel a reconveyance of the real estate, she would willingly deed it back and leave Mrs. Perry for all time. Mrs. Perry assured the plaintiff that her only purpose and desire was to be able to show her relatives and neighbors that she was still able to care for her own property, and that, if she (Mrs. Kenney) would reconvey the real estate without publicity, she (Mrs. Perry) would thereafter destroy her will and codicil so that Mrs. Kenney, who was her only heir, would inherit all her estate; that Mrs. Kenney would thereby receive more than she would by retaining the title to the real estate; that in consideration of this promise, and relying thereon, Mrs. Kenney consented to execute a deed transferring her interest as joint tenant to Mrs. Perry.

As indicating an intent to carry out her promise, Mrs. Perry later requested Mrs. Kenney to see that one Alton Munsey have from her estate the sum of $1,000 to complete his education, provided Mrs. Perry did not give it to him before she died.

Mrs. Perry, however, did not carry out the agreement to destroy her will, but on the contrary on March 1, 1929, while ill and about a month before her death, executed another codicil to her will made in October, 1925, which she had never destroyed, leaving Mrs. Kenney but $200.

While Mrs. Kenney, following Mrs. Perry's death, at first demanded that a sum be paid her for services, after consulting an attorney as to her rights, brought this action based on a breach of the alleged agreement in the sum of 1928, viz. that, if Mrs. Kenney would deed back the real estate to Mrs. Perry, she (Mrs. Perry) would destroy her will, so that Mrs. Kenney would inherit all her property.

Trial by jury was waived. The District Court found that up to the time of the reconveyance of the real estate in June, 1928, the facts were not open to serious controversy, showing clearly that at all times the proposal for Mrs. Kenney to live with Mrs. Perry and receive her property was that of Mrs. Perry and not that of Mrs. Kenney or her husband.

The District Court also found that, while at times there was some friction between them, due apparently to Mrs. Kenney's physical condition and Mrs. Perry's advancing years, it was always overlooked, and Mrs. Perry's protests of affection and a desire for her adopted daughter to have her property continued up to the winter of 1928; that during the winter prior to her death in April at the advanced age of eighty-six, and while Mrs. Kenney was in the South, there were other influences at work on Mrs. Perry that resulted in her failing to carry out her agreement and in practically disinheriting her adopted daughter.

Upon all the evidence the District Court, applying the rule as to the degree of proof required to sustain an oral promise to make a will prior to the statute of 1888, requiring such promise to be in writing, found that the evidence established with sufficient certainty that Mrs. Perry for a valuable consideration, viz. the reconveyance of the real estate, did

agree with Mrs. Kenney that she (Mrs. Perry) would destroy her will and codicil and would die intestate. And, while fraud on Mrs. Perry's part was not proven, there was a breach of the agreement on the part of Mrs. Perry, and Mrs. Kenney was entitled under the second count of her declaration to recover the net value of Mrs. Perry's estate, which the court found to be $31,503.89.

The assignment of errors on which the defendant relies are: (1) That the Massachusetts statute of frauds or wills precludes her recovery; (2) that certain evidence of an attorney by name of Horgan was wrongfully admitted; (3) that the court erred in refusing to rule that the plaintiff could not recover on all the evidence.

■ As to the first assignment of error, the contention is that the agreement on the part of Mrs. Perry to destroy her will and codicil and die intestate not being in writing and signed by her, since a part of her estate consisted of real estate, comes within clause 4 of section 1, chapter 259, G. L. Mass. But, as the District Court pointed out, if the agreement had been carried out, Mrs. Kenney would have taken title to the real estate, not by conveyance or sale, but by descent. Burt v. Merchants' Ins. Co., 106 Mass. 356, 364, 8 Am. Rep. 339; 51 C. J. 94, 95.

An agreement to make a will has been held to be within the section of the statute above referred to, Gould v. Mansfield, 103 Mass. 408, 4 Am. Rep. 573, and since 1888 by section 5 of chapter 259, G. L. Mass., must be in writing; but the agreement of Mrs. Perry, if one was made, was to destroy a will, which is not covered by either section of the statute of frauds above referred to. An agreement to die intestate is not within the statute. Stahl v. Stevenson, 102 Kan. 447, 450, 171 P. 1164. We think there was no error in the ruling of the District Court on this point.

■ There was no error in admitting the evidence of the attorney, Horgan. The objection was that the conversation which took place between the husband and Horgan was privileged, and the privilege was not waived. Counsel for the appellee contends that under the Massachusetts rule, Knowlton v. Fourth-Atlantic Nat. Bank, 264 Mass. 181, 196, 162 N. E. 356, the fact that Mr. Kenney took the stand and testified was a waiver of all personal privilege, and therefore the testimony of the attorney as to statements made to him by Mr. Kenney, even if he was consulted as an attorney, which Horgan says

he was not, were admissible. But we do not think they were admissible on this ground, since, unless they were admissible on other grounds, they were self-serving. However, we think they were admissible, having taken place in August, 1928, as showing that the claim of Mrs. Kenney that Mrs. Perry, in consideration of the reconveyance of the real estate in June, 1928, had agreed to destroy her will, was not an afterthought following Mrs. Perry's death, which charge had already been made by the defense in the case. The District Court properly limited the evidence to this point and ruled it could not be considered as showing what the agreement was. [3] As to the third assignment, that the District Court erred in refusing to rule that the plaintiff could not recover, this depends, the third assignment being without merit, on whether the facts found by the District Court were supported by any substantial evidence.

We think the facts found by the District Court were amply supported by the evidence, and that his rulings of law and final conclusion were sound.

The judgment of the District Court is affirmed without costs.

MORTON, Circuit Judge (dissenting).

I am unable to agree with so much of the foregoing opinion as holds that an oral agreement to die intestate is not within the Massachusetts statute of frauds (Gen. Laws c. 259, § 5). This section reads as follows: "No agreement to make a will of real or personal property or to give a legacy or make a devise shall be binding unless such agreement is in writing signed by the person whose executor or administrator is sought to be charged, or by some person by him duly authorized. This section shall not apply to any agreement made prior to May seventeenth, eighteen hundred and eighty-eight." There can be no doubt as to the dangers of fraud, imposition, and insecurity of property rights which the statute was designed to prevent, nor that all these dangers remain, though in a diminished degree, if the statute is construed as not covering oral agreements like that in question.

The point seems not to have been decided in the Massachusetts courts. In Downey v. Guilfoile, 96 Conn. 383, 114 A. 73, 75, it is said: "But it is proper to say that we see no difference in principle or reason between a promise to make compensation for services rendered by means of a positive provision in a will and a promise to effect such compensation by refraining from the act of making a

will. The object and the inducement are the same in either case, and the same reasons and objections can be urged for or against one method as well as the other." Burpee, J., at page 387 of 96 Conn., 114 A. 73. In Dicken v. McKinley, 163 Ill. 318, 45 N. E. 134, 54 Am. St. Rep. 471, it was held that an oral agreement by a party to make no will depriving a certain heir of the estate to which he would be entitled by descent was, in effect, an agreement to devise lands and was void under the statute of frauds. A contrary result was reached in Stahl v. Stevenson, 102 Kan. 447, 450, 171 P. 1164, cited in the majority opinion. In neither of the states where these decisions were made does there appear to be any provision in the statute of frauds relating to agreements about wills similar to that in Massachusetts. The cases referred to rest on the common provision relating to agreements about land.

The special provision in the Massachusetts statute greatly strengthens the case against such oral agreements. I cannot doubt that what the Legislature had in mind by the expression, "No agreement to make a will," etc., was really, "No agreement about making a will," etc. If oral agreements affecting testamentary disposition of property escape the statute, if thrown into the negative form, a wide door is opened to the sort of fraud which the statute was intended to prevent. Where the object of a statute is clearly evident, but the language used is inappropriate, a considerable liberality of construction is admissible to support the intended result.