# HARRISON *v.* STATE OF MARYLAND

[No. 202, September Term, 1974.]

*Decided October 7, 1975.*

The cause was argued before MURPHY, C. J., and SINGLEY, SMITH, DIGGES, LEVINE, ELDRIDGE and O'DONNELL, JJ.

*Lee Gordon* for appellant.

*David B. Allen, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General, Milton B. Allen, State's Attorney for Baltimore City,* and *Mark Kolman, Assistant State's Attorney for Baltimore City,* on the brief, for appellee.

O'DONNELL, J., delivered the opinion of the Court. MURPHY, C. J., and SMITH, J., dissent and SMITH, J., filed a dissenting opinion in which MURPHY, C. J., concurs in part at page 158 *infra.*

Following a three-day jury trial in the Criminal Court of Baltimore (before Harris, J.) the appellant, Charles Edward Harrison, Jr., was convicted on October 24, 1973, of the murder, in the first degree (murder committed in perpetration of a robbery), *see* Maryland Code (1957, 1971 Repl. Vol.), Art. 27, § 410. of one William James Morgan,[1] who

---

1. Morgan was also known by the names of William T. Graham and Melvin Graham.

died of a single gunshot wound of the chest in the early morning hours of July 18, 1970. Following denial of a motion for a new trial and from the imposition of life imprisonment Harrison appealed to the Court of Special Appeals. That court, in an unreported per curiam opinion, *Harrison v. State* [No. 904, September Term, 1973], affirmed his conviction on September 3, 1974. We granted a writ of certiorari limited solely to the questions:

(1) whether the trial judge erred in allowing the State to call appellant's former attorney as a rebuttal witness to testify as to the disclosure or non-disclosure of a vitally important, controverted issue; and

(2) whether the trial judge's admission of prejudicial, incriminating evidence against the appellant, namely by showing unrelated misconduct of appellant with drugs, denied appellant a fair trial.

We shall reverse upon both grounds.

Officer Charles Shorman, of the Baltimore City Police Department, at about 3:30 a.m. on July 18, 1970, heard a gunshot and immediately drove to the scene in front of a small store at 1326 Pennsylvania Avenue. He found the victim in a sitting position with the "whole right side" of his pants and his right pants pocket "ripped out." The officer testified that he could not determine whether or not at that time the victim "had any money on him."

Counsel stipulated that if Morgan's girlfriend, Mary L. Hogan, were called as a witness she would testify that on Friday, July 17th at about 8:15 p.m. she had loaned Morgan $213 which he placed in his wallet and that when she last saw him that evening, his clothing was undamaged.

The autopsy performed by the Assistant Medical Examiner was admitted into evidence by stipulation.[2]

---

2. *See* Maryland Code (1957, 1973 Repl. Vol.) Art. 22, § 8, providing for the admissibility as evidence the certified records of the Office of the Chief Medical Examiner of autopsies upon the bodies of deceased persons.

The only other witness in the State's case-in-chief was William Strait, a former resident of Baltimore, then a member of the United States Air Force, stationed in Colorado but residing in San Antonio, Texas. He testified that he, Harrison, and one Tony Wilson had left Cicero's, a club on Forrest Street, about 2:45 a.m. on that date in an automobile driven by Harrison. After leaving Tony Wilson in the 900 block of Pennsylvania Avenue, he and Harrison drove to the 1300 block of that avenue. Upon arrival Strait became engaged in conversation with a group of people on the east side of the street; Harrison remained on the west side where he was conversing with a man; Strait saw the man pressing Harrison's arms against his sides, but concluded that there was "no fight." Strait's conversation was interrupted when he heard a gun discharge, saw a flash, and then "everyone started running." From across the street, he stated he saw Harrison standing about four or five feet from the victim, with his right arm outstretched, holding what "seemed to be a pistol in his hand." He also testified that he had seen the appellant with a pistol stuck down in the belt of his pants earlier that evening at Cicero's.[3] It was Strait's testimony that he saw the appellant "ransacking the man's pockets" — on "the lower part of the man's body." Thereafter, according to Strait, Harrison ran through an open space, Strait joined him in the automobile and they drove to the 900 block of Pennsylvania Avenue where they picked up Tony Wilson. All then drove to a night club on Harford Road, with none of them discussing the incident in any fashion during the entire ride. Strait, who did not contact the police until some 10 days later, explained the delay by stating that his life had been threatened by Gary Wilson[4] and that the life of his girlfriend had been threatened, — the person threatening her going unidentified.

---

**3.** Strait, as a State's witness, was committed to jail in default of bail pursuant to Maryland Rule 732 since, as he explained it, "the police were afraid he would leave the State." His deposition was taken on November 19, 1970 pursuant to Maryland Rule 727 and therein he testified that he never saw the appellant with any gun earlier that evening.

**4.** The witness did not disclose the relationship between the Messrs. Tony and Gary Wilson; Harrison later testified that they were brothers.

Strait testified that he had known the appellant "for about two weeks" being employed with him by Gary Wilson, the manager of the Black Orchid club on Gay Street. He explained that Harrison at times drove Wilson, "danced" at the club and occasionally tended bar. His employment was serving customers. Upon direct examination Strait stated that Gary Wilson was "pushing narcotics" (marijuana); on cross-examination he acknowledged, however, that he had never seen marijuana sold at the Black Orchid but had seen him sell it at Cicero's.

This was the sum and substance of the State's case against the appellant,[5] at the conclusion of which the trial court denied his motion for judgment of acquittal as to murder in the second degree and as to manslaughter, but "reserved ruling" as to murder in the first degree.[6]

The first witness for the appellant was his friend Jeffrey Taylor. He testified that he had seen Harrison in the Baltimore City Jail while there serving a sentence for disorderly conduct and that he told Harrison, when he learned the charge upon which Harrison was confined that he had been a witness to the crime, that while walking from a nearby bar, had observed the incident from a distance of about 20 feet, and had seen the assailant run across the street, carrying a gun. He told Harrison that although he did not know the identity of the murderer, he knew that it was not Harrison.[7]

In his own defense, the appellant testified that he had worked from 8 p.m., July 17th, until 2 a.m., July 18, 1970, at the Black Orchid, when he and his employer drove "to East Baltimore" to pay wages to "a band leader;" they then drove to Cicero's, arriving about 2:45 a.m., where he saw Tony

---

5. Although 42 witnesses were listed by the State in its answer and supplements to the appellant's motion for discovery under Maryland Rule 728 a 3.

6. *See* State v. Sirbaugh, 27 Md. App. 290, 339 A. 2d 697 (1975), holding that Maryland Rule 563 is inapplicable to a criminal case and that a trial judge has no authority to reserve his ruling upon a motion for judgment of acquittal.

7. This vital information possessed by Taylor was apparently never related to the police but was relayed through Harrison to his counsel.

Wilson, Gary's brother, Gary's wife, and there for the first time met Strait.[8] He denied that he was at or near the scene of the crime and had remained at Cicero's until approximately 6 a.m., when, going outside, he again saw Strait, whom he had not seen in the interval, and that at about 6:15 a.m., at Strait's request, he drove him to the 1300 block Pennsylvania Avenue, leaving him off near the York Lounge.

Harrison was arrested at about 8:30 a.m. on August 2, 1970 (20 days after the homicide) at the Black Orchid. At the time of his arrest, several packets of marijuana were found in one of his boots which he stated had been left overnight behind the bar. He was separately indicted for possession of marijuana.

Following his appearance before the District Court on August 3rd, Harrison rode in the same "paddy wagon" with Strait (who had been committed as a State's witness) to the City Jail, and was there with him in the "bull-pen." After several attempts to relate a conversation with Strait, to which objections were sustained, he ultimately testified, following a reversal by the trial court of its ruling, when re-called as a witness, that in the jail "bull-pen," Strait had told him that he was a State's witness, that he knew that Harrison had been accused of the murder but that Harrison was not the assailant; that although Strait stated he knew "who did it," he was not going to disclose that fact to anyone and that the man killed "carried large sums of money." Harrison further testified that when he asked Strait why he was a witness against him, Strait "walked away;" that thereafter he never saw Strait, nor had the opportunity to further talk with him since they were not put "on the same section" in the jail.

On cross-examination, the prosecutor was permitted to elicit over strenuous objection, that Harrison had been in possession of marijuana at the time of his arrest at the Black Orchid. He was further asked on cross-examination,

---

8. Efforts to locate these witnesses by counsel were unsuccessful and none of them testified.

without objection, whether or not he had ever told his former attorney (Mr. Daneman) about this conversation with Strait at the jail, to which the appellant answered in the affirmative.

Strait, re-called as a rebuttal witness, acknowledged that he had been in the City Jail "bull-pen" with Harrison, but denied that he was ever alone with him, denied making such a statement and denied that he had ever been questioned concerning any such incident when deposed.

Although both sides had rested their cases, the prosecution, following a luncheon recess *in camera* moved to reopen its case to permit as additional rebuttal evidence the testimony of Donald Daneman, Esquire, who had been Harrison's counsel in December, 1970,[9] but who on December 20, 1971 had stricken his appearance.[10] Judge Harris granted the State's motion to re-open and over strenuous objection by counsel for the appellant (in the chambers conference) permitted Daneman to testify that during the period of time during which he represented him Harrison had never told him of such a conversation with Strait; that if he had, he surely would have questioned Strait about it upon the deposition.

### (1)

### *Attorney-Client Privilege*

Following a brief cross-examination about his conversation with Strait, the trial court addressed several questions to Harrison as follows:

"THE COURT: Well, if you were in the same jail with Mr. Strait such a long time, why didn't you go back to him and talk to him about the information that he had given you that he knew the person who had committed the murder?

"THE WITNESS: Well, over there you are put in

---

**9.** When the case had been originally removed to Caroline County for trial.
**10.** At the trial the appellant was represented by counsel assigned by the Public Defender.

a section, and he wasn't put on the same section with me. So, you just can't go from, you know, different sections to different sections, and I didn't see him any more.

"THE COURT: You never saw him in the ninety days?

"THE WITNESS: Until the day of the trial in November, the 20th. I haven't seen him since.[11]

"THE COURT: Didn't you think it was important to try to talk while you were there?

"THE WITNESS: Yes, I did, *but they wouldn't let me see him. I told my lawyer all about it.*

"THE COURT: Well, yesterday you were asked this question by Mr. Kolman, and he was speaking of Mr. Strait. You were asked, 'Then he had nothing against you?' Your answer was, 'As far as I know,' from which I could infer that in your opinion Strait had nothing against you.

"THE WITNESS: Yes.

"THE COURT: Why would you say he has nothing as far as you know against you when he told you that he knew who the real murderer was?

"THE WITNESS: I don't know.

"THE COURT: All right. I have no further questions."

(emphasis added)

The assistant prosecutor then re-questioned the appellant as follows:

"MR. KOLMAN: Based on the Court's questions, I have one other. *Did you tell your attorney, Mr. Daneman, about this case?*

"THE WITNESS: Yes, I did.

"BY MR. KOLMAN:

Q *About this conversation?*

---

11. Apparently referring to the date when Strait's deposition was taken pursuant to Rule 727. *See* n. 3 *supra.*

A Yes, I did.

Q Did you tell him prior to November, 1970?

A Yes, I did.

Q Did he ask Mr. Strait about this when the deposition was taken in November of 1970?

A I wouldn't know.

Q Isn't it a fact that there is no place in the 114 pages of this deposition that that is even mentioned?

A No.

"MR. KOLMAN: No questions."

(emphasis added)

In overruling objection to the proffered testimony of Daneman, Judge Harris, noting the holdings in *Morris v. State*, 4 Md. App. 252, 242 A. 2d 559 (1968), was of the view that although communications with counsel were privileged, the lack of communications was not and ruled that the testimony to be elicited was "not the disclosure of a communication as such [but] it's merely testimony that no such communication was ever made between the client and the attorney."

The Court of Special Appeals in rejecting this asserted error by the appellant, after quoting from *Shawmut Mining Co. v. Padgett*, 132 Md. 397, 404, 104 A. 40, 43 (1918); *Morris v. State, supra*; Wharton's *Criminal Evidence*, Vol. 3 § 561, and from Annot. 51 A.L.R.2d 521, § 5 [a] (1957), in its opinion stated:

"It is obvious that the alleged conversation at the jail between the appellant and Strait, *if communicated by the appellant to his attorney, was not communicated in confidence, but for the very purpose of making it public at the trial.* Even if the communication had been made and was intended to remain confidential, that confidence was *waived* when the appellant related the conversation in his testimony, and said that he had told his attorney about it.

"There was no error in permitting Mr. Daneman to testify, in rebuttal, that no such communication had been made to him."
(emphasis added)

The history of the attorney-client privilege dates back in the common law to at least the reign of Elizabeth I (1558-1603) and probably dates from the beginning of the compulsion of witnesses to testify. Until 1776, the privilege was not deemed to be that of the client but rather of the attorney as a "point of honor," a part of the professional accouterment of the gentlemen of the law. In that year the House of Lords in the *Duchess of Kingston's Trial* (20 Howell, State Trials 355, 586, (1776)) ruled that her attorney, whom she had exempted from secrecy, was required to respond to questions about his conversations with her some three decades earlier, even though the attorney had demurred, raising the point of honor.

From that time on, the genteel point of honor theory which would henceforth subordinate the attorney's claim to an order by the court came to an end. During the latter half of the Eighteenth Century, however, another theory was evolving concerning the privilege which protected the client from disclosure of secrets entrusted to the lawyer, rather than of simply allowing the lawyer to keep the client's confidences as a professional prerogative. On the dramatic collapse of the earlier conception of "point of honor" on the part of counsel, the newer theory came to the fore and gained acceptance over the succeeding decades. *See Rigolfi v. Superior Court*, 215 Cal. App. 2d 497, 500, 30 Cal. Rptr. 317, 319-20 (1963); 8 J. Wigmore, *Evidence*, §§ 2290-91 (McNaughton Rev. 1961); C. McCormick, *Evidence*, § 87 (2d ed. 1972).

Sir William Blackstone stated the rule this way: "[a]nd no counsel, attorney . . . intrusted with the secrets of the cause by the party himself, shall be compelled, or perhaps allowed, to give evidence of such conversation or matters of privacy, as come to his knowledge by virtue of such trust and confidence . . . ." 3 W. Blackstone Commentaries 370 (Amer. ed. 1922).

In 1862, in *Fulton v. Maccracken,* 18 Md. 528, 542-43, our predecessors stated that "[n]o rule is better established than 'that communication which a client makes to his legal adviser for the purpose of professional advice or aid shall not be disclosed, unless by the consent of the client for whose protection the rule was established.' "

In *Lanasa v. State,* 109 Md. 602, 71 A. 1058 (1909), this Court, in holding that statements made, by one of three persons who were indicted for conspiracy, to counsel for a co-defendant were not privileged communications and thus were admissible in evidence, stated through Judge Burke who delivered the opinion:

> "The result of the authorities is that to make the communications privileged they must be made during the existence of the actual relation of attorney and client, or during interviews and negotiations looking to the establishment of such a relationship between the parties, and must relate to professional advice and to the subject-matter about which such advice is sought. When such conditions exist the law *will not permit the counsel to divulge the communications without the consent of the client.* In *Chase's Case,* 1 Bland, 222, the Chancellor said: 'The policy of the law does not permit a solicitor to divulge the secrets of his client. Such confidential communications are *not to be revealed at any period of time, either before or after the suit has been brought to an end, or in any other case;* for, as to all such matter, *his mouth is shut forever.'* " 109 Md. at 617-18, 71 A. at 1064.
> (emphasis added)

In *Huester v. Clements,* 252 Md. 641, 250 A. 2d 855 (1969), in sustaining the ruling of the trial court which had taken testimony out of the presence of the jury, this Court found that an attorney-client relationship existed between Huester, the attorney, and Clements, upon their first meeting, that the privilege applied to Huester's testimony, and stated: "[o]nce the relationship of attorney and client

was established, *a fortiori*, the communication was confidential and inadmissible in evidence." 252 Md. at 646, 250 A. 2d at 859.

The Supreme Court, in *Alexander v. United States*, 138 U. S. 353 (1891), in holding that statements regarding the commission of a crime made by the party to an attorney, when consulting him were privileged communications, regardless of the payment of a fee, stated:

> "If he consulted him in the capacity of an attorney, and the communication was in the course of his employment, and *may be supposed to have been drawn out in consequence of the relations of the parties* to each other, neither the payment of a fee nor the pendency of litigation was necessary to entitle him to the privilege. *Williams v. Fitch*, 18 N. Y. 546; *Britton v. Lorenz*, 45 N. Y. 51; *Bacon v. Frisbie*, 80 N. Y. 394; *Andrews v. Simms*, 33 Arkansas, 771.
>
> "In the language of Mr. Justice Story, speaking for this court in *Chirac v. Reinicker*, 11 Wheat. 280, 294: 'Whatever facts, therefore, are communicated by a client to a counsel solely on account of that relation, such counsel are not at liberty, even if they wish, to disclose; and *the law holds their testimony incompetent.*' " 138 U. S. at 358. (emphasis added)

The privilege is an accommodation of competing public interests, the ascendency for compelling policy reasons of the protection from unauthorized disclosure of communications between an attorney and his client over the general testimonial duty and compulsion in the interest of truth and justice. The attorney-client privilege is basic to a relation of trust and confidence that, though not given express constitutional security, is nonetheless essentially interrelated with the specific constitutional guaranties of the individual's right to counsel and immunity from self-incrimination, the oldest of the privileges for

confidential communications, going back to the reign of Elizabeth I where it stood unquestioned "as a natural exception to the then novel right of testimonial compulsion."

"The essential policy of the privilege is grounded in the subjective consideration of the client's freedom from apprehension in consulting his legal advisor, assured by removing the risk of disclosure by the attorney even at the hands of the law." *See State v. Kociolek,* 23 N. J. 400, 415, 129 A. 2d 417, 425 (1957), citing J. Wigmore, *Evidence,* § 2291 (3d ed. 1940).

In *People v. Lynch,* 23 N.Y.2d 262, 271, 244 N.E.2d 29, 35 (1968) Judge Breitel for the New York Court of Appeals expressed the view that the freedom of confidential communication between lawyer and client is "[p]erhaps as valuable as the privilege against self-incrimination."

In *Morris v. State, supra,* the Court of Special Appeals affirmed a conviction of obtaining welfare benefits under false pretenses of one using the name of George Chesnut, while gainfully employed as George Morris. The State had offered in evidence several documents produced by an attorney who formerly represented the appellant in a civil matter which bore the signature "George Morris." Over objection, the attorney's receptionist, testified that the appellant was known to her both as "George Morris" and as "George Chesnut" and that the office files indicated that he used both names.

In holding that "the rule making communications between attorney and client privileged from disclosure ordinarily does not apply where the inquiry is confined to the fact of the attorney's employment and the name of the person employing him, since the privilege presupposes the relationship of client and attorney and therefore it does not attach to its creation," that court pointed out that the principle of the privilege was grounded in the common law and remained unchanged even in states which had enacted statutes since such statutes have been interpreted as reflecting the common law doctrine.

The Court of Special Appeals stated:

"Professor Wigmore phrases the principle as follows (supra, Sec. 2292):

' (1) Where legal advice of kind is sought (2) from a professional legal adviser in his capacity as such, (3) the communications relating to that purpose, (4) made in confidence (5) by the client, (6) are at his insistence permanently protected (7) from disclosure by himself or by the legal adviser, (8) except the protection be waived.'

"It is apparent from the foregoing statement that what is sought primarily to be protected are the communications between the client and the attorney, the modern theory being that an individual in a free society should be encouraged to consult with his attorney whose function is to counsel and advise him and he should be free from apprehension of compelled disclosures by his legal advisor. Miller, *The Challenge to the Attorney-Client Privilege*, 39 Va. L. R. 262, 268 (1963)." 4 Md. App. at 254, 242 A. 2d at 560.

See also *Bieber v. State*, 8 Md. App. 522, 546-48, 261 A. 2d 202, 215-16 (1970) holding that the attorney-client relationship did not come into existence where the attorney had become only a depository of a false deed of trust so that the appellant's conversation when the deed was turned over was not protected by the privilege.

Five years after the decision in *Morris*, the General Assembly, by Ch. 2, § 1, Laws of 1973, 1st Spec. Sess. enacted what is now codified in Maryland Code (1974), Courts and Judicial Proceedings Article as § 9-108, which succinctly states that "A person may not be compelled to testify in violation of the attorney-client privilege." [12]

12. The revisor's note states that although the section is "new language which does not presently appear in the Code," it is a statement of a common-law principle that has long been established, citing Morris v. State, 4 Md. App. 252, 254 [242 A. 2d 559] (1968).

When the privilege is invoked the existence of the attorney-client relationship and whether or not any such communication is privileged are questions in the first instance for the trial court. In order to make such determinations that court should make a preliminary inquiry and hear testimony relative thereto out of the presence of the jury, looking at all the surrounding facts and circumstances. The threshold question of the existence of the privilege must be determined without first requiring disclosure of the communication. *Steiner v. United States*, 134 F. 2d 931, 935 (5th Cir.) *cert. denied*, 319 U. S. 774 (1943); *Miller v. Anderson*, 30 Conn. Supp. 501, 294 A. 2d 344, 347 (1972). *In accord Huester v. Clements, supra*, at 646, 250 A. 2d at 859; *Bieber v. State, supra*, at 547, 261 A. 2d at 215.

In its brief and argument before us the appellee has abandoned the premise postulated by the Court of Special Appeals when it stated that if the alleged conversation between the appellant and Strait was communicated to his attorney, it "was not communicated in confidence, but for the very purpose of making it public at the trial" and argues exclusively that the privilege was waived by the appellant's responses to the prosecutor on cross-examination. The appellant, recognizing that generally when a client gives testimony concerning a communication with his attorney, the privilege may be waived contends nonetheless that waiver is inapplicable where the subject matter of the communication was elicited, as it was here, upon cross-examination when the appellant, asked whether he had told his attorney "about this conversation" replied merely that "he had."

Generally, the client's offer by his own testimony as to a specific communication with his attorney constitutes a waiver as to all other communications to the attorney on the same subject matter. The attorney's testimony concerning such communications thus becomes admissible by virtue of the client's voluntary testimony in that regard. *See* 8 J. Wigmore, *supra*, § 2327; C. McCormick, *supra*, § 93; 3 Wharton's *Criminal Evidence*, § 561 (13th ed. 1973); 58 Am.

Jur. *Witnesses*, § 526 (1938); Annot. 51 A.L.R.2d 521, 529-37, § 5 (1957).

When these authorities speak of the client voluntarily revealing at trial communications to his attorney as constituting a waiver of the privilege of confidentiality such testimony has been generally shown to have been given by the client upon direct examination. *See* Annot. 51 A.L.R.2d, *supra*, at 531-37.

Dean Wigmore does not seem to make any distinction in connection with a waiver of the privilege between testimony given by the client on direct examination or that educed upon cross-examination. Professor McCormick suggests that the "usual rule" as to waiver should apply, upon the client's failure to claim the privilege "when to his knowledge testimony infringing it is offered" — "unless there are some circumstances which show that the client was surprised or mislead." C. McCormick, *supra*, at 195. Although he further expresses the view "that the decisions treating such testimony on cross-examination as being involuntary and not constituting a waiver" are hardly supportable, he recognizes that "it is arguable that a layman might not realize, upon cross-examination, when he anticipated making such an answer, that there was any occasion to claim the privilege." C. McCormick, *supra*, at 195 n. 20. Wharton's *Criminal Evidence* states: "[t]he fact that a defendant testifies in its own behalf does not effect a waiver of the privilege. But if, in testifying he refers to a communication with his attorney, he thereby waives the privileged character of such communication." Similarly, the text makes no distinction as to whether the testimony by the client is given upon direct or cross-examination. *See* Wharton's *Criminal Evidence*, *supra*, at 82-83.

Although waiver by implication is universally recognized and even though it need not be expressed in writing nor in any particular form, the intent to waive must, however, be expressed either by word or act, or omission to speak out. Once the confidential matter has been disclosed, it is no longer secret and the privilege which might be claimed

disappears. *See Chore-Time Equip., Inc. v. Big Dutchman, Inc.,* 258 F. Supp. 233, 234 (W.D. Mich. 1966).

This Court in *Shawmut Mining Co. v. Padgett, supra,* relied upon by the Court of Special Appeals, in finding that there had been a waiver, and in recognizing that it may be by implication, stated:

"The privilege resulting from communications between attorney and client is designed to secure the client's confidence in the secrecy of his communication, but it assumes, of course, that the communications are made with the intention of confidentiality. The moment confidence ceases, privilege ceases. *Wigmore on Evidence,* sec. 2311. If Yates did not recognize Hecht as his attorney the communications were not made to him as his attorney, and consequently such circumstances were without the confidentiality that is requisite, under the rule, to make it a privileged communication. It may also be said that while the privilege is for the protection of the client, *he may waive the privilege, and this may be done by implication,* for instance, he can not be allowed, after disclosing as much as he pleases, to withhold the remainder." 132 Md. at 404, 104 A. at 43. (emphasis added)

Since a voluntary disclosure deprives a subsequent claim of privilege based upon confidentiality, and since traditionally waiver is described as the intentional relinquishment of a known right, *see Johnson v. Zerbst,* 304 U. S. 458, 464 (1938), in determining waiver by implication "regard must be had to the double elements that are predicated in every waiver, *i.e.,* not only the element of implied intention, but also the element of fairness and consistency." 8 J. Wigmore, *supra,* § 2327 at 636; *Rigolfi v. Superior Court, supra,* at 502, 30 Cal. Rptr. at 320.

In those cases where courts have found a waiver of the privilege based upon the disclosure of the communications with counsel upon cross-examination, the disclosures have

generally been substantive and detailed. *See Steen v. First Nat'l. Bank*, 298 F. 36, 41-42 (8th Cir. 1924) (where the bank president upon cross-examination at the appellant's preliminary hearing on a criminal charge, had, without claiming privilege, testified to the statements he had made to and conversations he had had with his attorney concerning the institution of the criminal charges against the appellant); *Pinson v. Campbell*, 124 Mo. App. 260, 101 S. W. 621 (1907), (where the prosecutor, on cross-examination, without objection, had testified about his employment of an attorney to assist in the prosecution of Pinson and related all the conversations he had had with the attorney in respect to the institution of the criminal prosecution). Similarly, in *Raleigh & C. R. Co. v. Jones*, 104 S. C. 332, 88 S. E. 896 (1916), (the appellee-client, on cross-examination had testified extensively as to the transactions and communications between him and his attorney).

*See also Hurley v. McMillan*, 268 S.W.2d 229 (Tex. Civ. App. 1954) (where the appellee as an insured, had given a written statement to an adjuster concerning the happening of an automobile accident which was at variance with his trial testimony and was extensively cross-examined about the content of the statement, and the Court of Civil Appeals of Texas, noting no claim of privilege by the witness, found that such statement was not a privileged communication between an attorney and client and further pointed out that "[t]he policy of the Supreme Court of Texas has been to restrict the application of the rule of privilege, because it tends to prevent the full disclosure of the truth." 268 S.W.2d at 232.)

*See*, however, *Key v. State*, 235 Ind. 172, 132 N.E.2d 143 (1956) where, in the appellant's trial for burglary, the only evidence to connect him with the crime was that by an accomplice who admitted on cross-examination that he had made prior statements to his attorney Hayes, that the appellant "had nothing to do with the crime." When appellant's counsel attempted to question Hayes about any such prior statements made to him by the accomplice, the

trial court excluded the evidence on the ground of attorney-client privilege. That court held that the exclusion of the attorney's testimony was erroneous since his client had waived the privilege. Finding that the ruling was prejudicial to the appellant-defendant that court pointed out that his conviction "could only rest on the crucial testimony of the accomplice sought to be attacked here by the appellant. With this sole witness' credibility at stake, we cannot conclude appellant's substantial rights were not affected." 235 Ind. at 178, 132 N.E.2d at 147.

The better-reasoned cases, as we see them, clearly hold a contrary view.

In *People v. Kor*, 129 Cal.App.2d 436, 277 P. 2d 94 (1954), Kor and a co-defendant, Kaufman, were charged jointly with the possession of narcotics. They were arrested in an automobile, operated by Kor, with a package of heroin in the center of the front seat. On appeal, Kor contended that the relationship of attorney and client existed between him and Joseph Rosen, an attorney, and that the trial court erred in receiving, over objection, Rosen's testimony regarding confidential communications.

On *direct* examination Kor had testified that he contacted Rosen, told him "what had happened and how it happened" and made arrangements with him for payment of a counsel fee; that "all that was discussed was getting out on a writ" and the attorney did get him so released. Upon *cross-examination* by counsel for Kaufman, Kor was asked if he had told Rosen that the package [of heroin] was his (Kor's) and that Kaufman knew nothing about it. He replied that "I don't think I said that." He was then asked: "Is it your testimony now that you made no such statement to Mr. Rosen?" Kor replied "I might have said it was mine, yes." Kaufman's counsel then asked Kor "Were you still taking the blame for Mr. Kaufman?," to which he answered, "Yes, I had already told him I would take the blame." The deputy district attorney also cross-examined Kor about the conversation with Rosen and whether he had told Rosen that the package was his.

Kaufman's attorney subpoenaed Rosen as a witness; when asked to relate the conversation with Kor, Rosen refused on the ground that the communication was confidential. Kor's counsel also objected on the ground of privilege. The trial court directed Rosen to answer the question. When Rosen demurred, the trial court indicated that his refusal to testify would subject him to a penalty for contempt. Rosen then related virtually verbatim the account Kor had given him of the facts in connection with his arrest, and that he had told him that Kaufman had picked up the package at Kor's direction and that Kaufman "did not know what was in the package."

In reversing Kor's conviction and in holding that he had been denied "his fundamental right to be protected against disclosure of confidential communications between him and his attorney and prevented him from having a fair trial," the court found that the testimony given on direct examination by Kor "that he had told the attorney 'what had happened and how it happened' was a general statement which did not disclose or purport to disclose, what words were used by Kor in telling him of the happening or what in substance was said to him;" that such statement revealed nothing that was confidential and there thus appeared "no basis in the direct examination of Kor for a claim that Kor waived his rights to object to his attorney testifying as to privileged communication." In further holding that his responses on cross-examination similarly did not constitute a waiver of the privilege, the court stated:

> "The answers of Kor on such cross-examination were responsive to the questions, did not include volunteered information as to privileged communications, and were not voluntary disclosures of privileged communications. It cannot be said that Kor, by so answering such questions of Kaufman's counsel and the deputy district attorney, *intended thereby to consent that his attorney might be examined* as to communications made in confidence by Kor to his attorney. Such

answers did not constitute a basis for a claim that Kor waived his right to object to his attorney testifying as to privileged communications." 129 Cal.App.2d at 445, 277 P. 2d at 100.
(emphasis added)

The court also rejected the argument made by the attorney general that the invocation of the privilege was being used as a shield to conceal the truth when the person claiming the privilege is falsely accusing another of crime. The court stated: "That statement assumes that Kor was falsely accusing Kaufman, . . . it assumes that Kor's testimony — to the effect that he agreed to take the blame for Kaufman — was false. That statement is also susceptible of the interpretation that communications between attorney and client should not be regarded as privileged communications if the client, as a witness, is not telling the truth and is using the privilege as a shield to conceal the truth. Under that view of the relationship between attorney and client, the fundamental doctrine of privileged communications between attorney and client might become of no importance since the truth of the client's testimony could easily be brought into question." *Id.* at 446, 277 P. 2d at 100. The court also reasoned that the "statement of the attorney general assumes that the truth would be revealed by the testimony of the attorney" and that even though the attorney might testify precisely as to what Kor had told him, that statement by Kor to the attorney might not be the truth as to what actually occurred.

Although *Kor* was decided under a California statute which provided that "[a]n attorney can not without the consent of his client be examined as to any communication made by the client to him . . ." a virtually identical statute was held to be declarative of the common law. *See State v. Sullivan,* 60 Wash. 2d 214, 217, 373 P. 2d 474, 475 (1962); *see also* Maryland Code (1974), Courts and Judicial Proceedings Article, § 9-108; *Morris v. State, supra.*

In *Seaboard Air Line Ry. v. Parker,* 65 Fla. 543, 62 So. 589 (1913) the appellee alleged that he had been "ruptured" when

as a passenger boarding a car of the appellant, the train was negligently moved. On cross-examination he testified, without objection, that he had made a statement about the accident to an attorney with a view to retaining him, but denied that he had told the attorney that he had suffered a rupture before the accident. The attorney who had been consulted but whose retention had been cancelled, called as a witness by the appellant was asked if the plaintiff had stated to him "that he had been ruptured before the accident complained of." The attorney requested the trial court to rule whether the matter was privileged and the court so ruled. On appeal, that ruling was held not to have been erroneous since the testimony on cross-examination was "not a waiver of the privilege that existed between the plaintiff and the attorney" when the communication covered by the question may have been made.

*People v. Moore,* 42 App.Div.2d 268, 346 N.Y.S.2d 363 (1973) similarly involved the question of waiver as a result of responses on cross-examination in a criminal proceeding. Moore, on trial for assault, during cross-examination was asked by the assistant district attorney whether he had not previously made a written statement concerning the facts in the case. He replied that he had, that he had read the statement (apparently given to or prepared by counsel who had been consulted in connection with a civil suit) two months after the incident and had discarded it. Although no further attempts were made to produce the statement or the attorney to whom it had been given, the prosecutor in summation to the jury made issue that the defendant had failed to produce the pre-trial written statement and that therefore "we don't know what was in that statement."

The New York Court, recognizing that a defendant who testifies in his own behalf waives the constitutional and statutory protection against self-incrimination, but that such testimony, "did not constitute a waiver of the rules governing the competence and admissibility of evidence, and, in particular, those dealing with privileged communications between a defendant and his lawyer;" held

that although such privilege may be waived "no waiver may be implied simply from the fact that a defendant in a criminal case takes the witness stand in his own defense (8 Wigmore, Evidence, § 2327)." *Id.* at 271, 346 N.Y.S.2d at 367.

In holding that there had been no waiver, that court stated:

> "Under such circumstances, the fact that the defendant on *cross-examination acknowledged the prior existence of the statement does not constitute a waiver of the privilege by implication* (cf. Wigmore, Evidence, *op. cit.*; Richardson, Evidence [9th ed.], § 434; Kaufman v. Rosenshine, 97 App.Div. 514, 90 N.Y.S. 205, affd., 183 N.Y. 562, 76 N.E. 1098). The grave error of the prosecutor in demanding production of the statement (People v. Gibson, 218 N.Y. 70, 75, 112 N.E. 730, 732) was made more egregious by the clear and necessarily intended implication in the prosecutor's remarks during summation that the statement contained incriminating information and that it was being improperly withheld because of that fact. This error was fundamental and substantial." 42 App. Div. at 272, 346 N.Y.S.2d at 368. (emphasis added)

*Kaufman v. Rosenshine*, 97 App. Div. 514, 90 N.Y.S. 205 (1904) *aff'd*, 183 N. Y. 562, 76 N. E. 1098 (1906) and cited in *People v. Moore, supra,* was an action by the plaintiff's assignor to recover money alleged to have been loaned the defendants. Upon cross-examination of the assignor the defendant asked her if she had, in a prior divorce proceeding, in which she had filed an affidavit stating that she had no separate property, told her attorneys anything concerning the $2,000 being on deposit with the defendants. She answered "Yes; I told him of my possessions." One of the attorneys who had represented her in those proceedings was called as a witness by the defense for the purpose of contradicting that testimony. He was not permitted to so testify on the ground that the communication was privileged. That court on the authority of *Tate v. Tate's*

*Executor,* 75 Va. 522, 533 (1881) held that the response on cross-examination did not constitute a waiver of the privilege.

In *Tate v. Tate's Executor, supra,* the Supreme Court of Appeals of Virginia, in holding that the appellant's testimony on cross-examination, "with respect to the conversation" he had with his attorney did not constitute a waiver since such a waiver "must be distinct and unequivocal," stated:

> "If, however, the client offers himself as a witness, he may be asked as to his communications to his counsel, if it be part of the case he undertakes to prove. 1 Wharton on Evidence, § 927, and notes. In the present instance, however, the client did not, upon his examination in chief, make any disclosure or statement with regard to any conversation between himself and Mr. Gilmore.
>
> "His testimony was brought out *by the adverse counsel upon the cross-examination.*
>
> "To allow one party to extract from his adversary a conversation between the latter and his attorney, and then to call the attorney to contradict the client, would result in the grossest injustice. It would create an antagonism between the attorney and client, and in effect destroy the rule which treats such communications as privileged. No man would ever feel safe in consulting a lawyer if such a doctrine was once established by the courts." 75 Va. at 533.
> (emphasis added)

As in this case, *State v. James,* 34 S. C. 49, 12 S. E. 657 (1891) involved a prosecution for murder. Scott, an accomplice, "turned State's evidence" and testified against James. Upon cross-examination Scott was queried as to whether he had been visited in jail by his attorney and then asked: "Did you, in jail, tell Mr. Ward that you knew nothing about the murder of old man James, that young Joe James

never spoke to you about killing his father, and that all you had said about his hiring you to do it was false, and you said it because you were afraid, that the sheriff had threatened you, and drawn his pistol on you, or words to that effect?" Scott answered "No, sir. He asked me did the sheriff draw a pistol on me, and I told him 'No.' He asked me did Sheriff Cole draw a pistol on me, and I told him 'No, sir'."

The defendant called attorney Ward, who testified that he had visited Scott at the jail. When asked to state the account which Scott had given him of the killing, the state objected and Ward stated that he regarded the conversation as confidential since as counsel he thought he could use such information to Scott's benefit. Ward declined to disclose the communications unless so ordered. The trial court refused to compel Ward to disclose the conversation.

In holding that Scott, by the answers given upon cross-examination, had not waived the privilege and that the ruling of the trial court was not erroneous, the Supreme Court of South Carolina stated:

> "[I]f we assume that Scott had the right to waive his protection against disclosure by his attorney, did he do so? In section 500 of Wharton's Criminal Evidence, it is said that 'while the privilege may be waived by the client, *the evidence of the waiver must be distinct and unequivocal.*' There was certainly no express waiver made by Scott; on the contrary, it is urged that by going on the stand himself, when called as an ordinary witness, he thereby 'waived' his right of protection, not only as to himself, but also so far as his attorney was concerned. *We do not see how that can be considered as 'unequivocal' evidence of consent.* The fact that the client, being a party, testifies in his own behalf, is generally held not to be such a waiver of his privilege as to compel him to disclose such communications." 34 S.C. at 58, 12 S.E. at 661. (emphasis added)

Compare *Key v. State, supra; see also Raleigh & C. R. Co. v. Jones, supra.*

We think that the rationale for holdings that there is no waiver of the privilege, where the subject matter of the communication with the witness' attorney has been first elicited upon cross-examination, was persuasively stated in *Burgess v. Sims Drug Co.,* 114 Iowa 275, 86 N. W. 307 (1901). In that case the appellee was sued for the negligent compounding of a prescription. The appellant upon cross-examination was questioned, and answered without objection as to what he had told his physician concerning the cause of the injury to his eye. When the appellee called the physician as a witness the trial court excluded his testimony on the ground that such communication was privileged. An Iowa statute precluded the disclosure by any attorney or physician of "any confidential communication properly entrusted to him in his professional capacity." Finding that the Code provision extended to physicians the same "complete protection" which by common law was recognized as applicable to communications between client and attorney, the court held that there had been no waiver of the privilege, nor error in excluding the physician's testimony, stating:

"It is well settled that the client or patient may waive his privilege, not merely by failing to make objection to the evidence of the attorney or physician when offered, but also by conduct from which a waiver may be imputed, — such as by himself testifying as to the subject-matter of such communications. People v. Gallagher, 75 Mich. 512, 42 N.W. 1063; State v. Tall, 43 Minn. 273, 45 N.W. 449; Hunt v. Blackburn, 128 U.S. 464, 9 Sup. Ct. 125, 32 L. Ed. 488; McKinney v. Railroad Co., 104 N.Y. 352, 10 N.E. 544. But the *testimony of the client or patient as to the communication which will constitute a waiver of the privilege so as to admit the attorney or physician to testify with reference thereto must be voluntarily given; for the privilege*

*is that of the client or patient, and it exists in his favor until in some way abandoned.* No doubt, under this privilege, the *client* or patient *may refuse to answer on cross-examination* when asked with reference to the privileged communication. Barker v. Kuhn, 38 Iowa, 392; Bigler v. Reyner, 43 Ind. 122; Hemenway v. Smith, 28 Vt. 701; State v. White, 19 Kan. 445, 27 Am. Rep. 137; Duttenhofer v. State, 34 Ohio St. 91, 32 Am. Rep. 362. *But we are not willing to hold that the failure to insist on this privilege makes the testimony which he may give on cross-examination voluntary, in such sense as to constitute a waiver of his privilege with reference to the communication to his attorney or physician."*

\* \* \*

"In the case before us it is evident that any objection of the witness on cross-examination to testify as to the communication might well have been prejudicial, and therefore *that the answer of the witness with reference thereto cannot be treated as a waiver of the privilege, for it is essentially not voluntary.* If counsel saw fit on cross-examination to inquire into this matter, he must be bound by the answer, and cannot afterwards claim that the witness, by answering without objection, voluntarily waived the privilege." 114 Iowa at 280-81, 86 N.W. at 309. (emphasis added)

*See also Lauer v. Banning,* 140 Iowa 319, 118 N. W. 446 (1908); 152 Iowa 99, 131 N. W. 783 (1911).

In an excellent review of the law of evidence concerning the attorney-client privilege and its waiver, it is noted that when a privileged communication is disclosed merely through cross-examination the majority of the courts hold that there is no waiver of the privilege nor the right to insist upon a prohibition of testimony from the attorney. *See* Note, 16 Minn. L. Rev. 818 (1932).

Indeed, there is authority that the expounding upon

cross-examination of questions which inquire into communications between the witness and the attorney constitutes prejudicial error, when properly preserved. *See Rienzo v. Santangelo,* 160 Conn. 391, 279 A. 2d 565 (1971) and *McConnell v. City of Osage,* 80 Iowa 293, 45 N. W. 550 (1890). In *Rienzo,* in an action for damages claimed by the plaintiff to have been sustained upon the defendant's premises as a result of its negligence, counsel for the defendant, upon cross-examination asked: "Did you tell your attorney where on the premises this accident occurred?" The trial court, over objection of her counsel, ordered her to respond and she answered "Yes." The Connecticut court finding that it was "clear that by asking this question the defense counsel was trying to create the inference in the minds of the jury that the plaintiff must have related to her attorney a location where her injuries occurred other than that to which she had testified," pointed out that the privilege, "being for the protection of the client in his subjective freedom of consultation obviously would be defeated if the disclosure of the confidences, though not compellable from the attorney, was still obtainable from the client," and concluded that the purpose and effect of the question was to reveal a direct communication from client to attorney.

That court held that "under the circumstances of this case we consider no essential distinction between the question, 'What did you tell your attorney?' and the question in issue. The attorney-client privilege is not to be vitiated by a distinction in semantics. The resort to the question in issue went beyond the scope of proper cross-examination and was an improper invasion of privilege. It was clearly prejudicial and harmful." 160 Conn. at 396, 279 A. 2d at 567.

In *McConnell,* the appellant had brought suit for damages for a fall on a defective sidewalk. In her direct testimony she set forth what her physical condition had been for several years preceding her injury — purportedly in contrast to her ailments and disabilities subsequent to the incident. Upon cross-examination she was asked: "Are you willing that the physicians who have treated you for the past ten or fifteen years may disclose to this jury any conversation you made to

them, at times they treated you in reference to your condition?" Upon objection being overruled, she answered that "she was not."

The Iowa court stated that:

> "It [the privilege] is a legal right, and a party should no more be required to state under oath that he did not want to surrender it than any other legal right he possessed. *We think a fair trial requires that such a matter should not even be referred to; that a jury should not be impressed with a belief that there is even reluctance to giving such assent. The subject-matter of such a waiver has no place for reference in the taking of testimony except by the party permitted to make it.* That prejudice resulted from the ruling in question is more than probable. After making oath that she would not consent to the testimony, the jury was left to assume something, — we know not what. It would naturally believe that, if assent had been given, testimony unfavorable to the plaintiff would have been the result. However, we need not speculate as to the probable consequences. It was clearly error." 80 Iowa at 303, 45 N.W. at 553.
>
> (emphasis added)

Since counsel for Harrison did not object to the question propounded by the assistant prosecutor as to whether he had told his (former) attorney "about this conversation," and did not thus preserve the point for review, the holdings in *Rienzo* and in *McConnell* are inapposite. But, as pointed out in *Burgess,* "it is evident that any objection of the witness on cross-examination to testify to the communication might well [itself] have been prejudicial" since such objection, were it sustained, would obviously convey to the jury the idea that a different version had been communicated to the attorney. *See also McConnell, supra.*

As we see it, we do not think that the appellant's reply to the trial court when he stated "I told my lawyer all about it" in response to the court's question concerning any attempt

to further converse with Strait, can be considered as constituting a waiver of the privilege. It was a general statement which did not disclose, or purport to disclose what words were used — or what the conversation was — nothing which was confidential was thereby revealed. *People v. Kor, supra.* Additionally, the answer "all about it" was itself ambiguous. Although it could be strained to be construed as meaning that he had told his lawyer what Strait had told him in the jail and that he had tried to further converse with him but had been unable to do so, it could with equal force be construed as being limited to the fact that because Strait was in one section of the jail and he was in another he had told his lawyer that he had been unable to later come in contact with Strait.

Procedurally, we think Judge Harris erred in not conducting a preliminary inquiry out of the presence of the jury and hearing testimony of all the surrounding facts and circumstances to determine initially whether a confidential relationship existed between Harrison and Daneman, and if so, whether or not there had been a waiver of the privilege. It appears that the trial court required a disclosure of the communication without first determining the existence of the privilege. *Steiner v. United States, Miller v. Anderson, Huester v. Clements, Bieber v. State,* all *supra.* Although the trial court made its rulings upon a proffer in chambers by the assistant prosecutor, no inquiry was made at all as to whether Daneman intended to invoke confidentiality. *See* Canon 4, (*A Lawyer Should Preserve the Confidences and Secrets of a Client*) EC 4-1, 4-4-6, and Disciplinary Rules DR 4-101 (B) (1) (Code (1957, 1971 Repl. Vol.), Maryland Rules, App. F, Code of Professional Resp., at 1019-20). Daneman not expressing any of the concern evidenced by attorney Rosen in *People v. Kor, supra,* neither asserted the privilege nor asked the court for guidance, *see State v. James, supra,* but apparently without any direction by the court disclosed the confidences of his erstwhile client to the prosecutor over the luncheon recess, and Daneman's disclosure became the predicate upon which the case was permitted to be re-opened and his impeaching testimony presented before the jury.

We can find no basis in law in the ruling by the trial court when a distinction was drawn between "the disclosure of [the contents] of a communication" as distinguished from the fact that "no such communication was ever made between the client and the attorney." *See Rienzo v. Santangelo, supra.* The subject matter of the prosecutor's question went to a "conversation" between the appellant and his attorney, the subject-matter of the inquiry was directed to the dialogue between Harrison and the counsel then representing him and the discussions between them. The holding in *Morris v. State, supra,* noted by the trial court, as we read it, does not support such a distinction concerning what is within or without a "conversation."

Nowhere in Harrison's direct examination had any reference been made to any conversations with either his trial attorney or his former counsel. Nowhere did he undertake to relate in substance by words what he had factually disclosed to Daneman. Even accepting Professor McCormick's view it is not difficult, upon the facts here, to conclude that the appellant as "a layman might not realize, upon cross-examination, when he anticipated making such an answer that there was any occasion to claim the privilege." It is equally not difficult to conclude that there were then present "circumstances which show that the client [Harrison] was surprised or mislead" by the question posed upon cross-examination — did you tell your attorney "about this conversation." It can certainly not be said that this response, in the context in which it was made, was voluntary and established "distinct and unequivocal" evidence of an intention on his part to waive his privilege. In our view, considering the policy of this Court's steadfast recognition and protection of the confidentiality arising from the attorney-client relationship, it would be grossly unjust to conclude that Harrison, by this simple, nonsubstantive affirmative answer intended implicitly to surrender and waive the privilege of his communications with his counsel.

Upon the holdings of what we consider to be the better-reasoned cases, as we have set them forth, we cannot conclude, as did the Court of Special Appeals, that when,

upon cross-examination, the appellant replied that he had told Mr. Daneman "about this conversation [with Strait]" he waived the privilege personal to him, arising from his relationship. We hold that it was prejudicial error, over his counsel's vigorous objection, to have permitted Daneman to impeach that response by his testimony that no such conversation had taken place.

(2)

### Possession of Marijuana

The Court of Special Appeals in rejecting the appellant's contention that he had been the victim of prejudicial error in the admissibility of evidence concerning his possession of marijuana, stated:

"Evidence by which the State sought to show activities of Gary Wilson in addition to operating the Black Orchid nightclub, and, *at least by inference, activities of appellant as Wilson's employee, were directed at showing motive for the crime for which appellant was on trial.* Evidence that Wilson was a marihuana dealer led also to cross examination of appellant on that point, and brought out that when appellant was arrested on 2 August 1970 the police found several packets of marihuana in one of his boots. The trial judge limited this phase of appellant's cross examination to questions designed to bring out appellant's relationship to his employer's activities as a marihuana dealer."
(emphasis added)

After quoting from *Lowery v. State,* 202 Md. 314, at 318, 96 A. 2d 20 at 22 (1953), the Court of Special Appeals concluded:

"In its quest for evidence of a motive the State produced very little of any substantial weight, but *failure to succeed does not affect the relevancy of the attempt.* We think the evidence *was relevant*

> *to motive or intent,* and *was admissible for that*
> *purpose.* It did not become inadmissible because
> it may have involved overtones of character."
> (emphasis added)

As best we can surmise, it was apparently the thesis of the State that Morgan's murder was in some way related to a marijuana transaction. After Strait related facts from which it could be easily found that Morgan had been robbed, he testified upon the State's question that Gary Wilson "was pushing narcotics (marijuana)," although he conceded that his information about such "another business interest" was from seeing such a transaction at Cicero's, he had never seen marijuana sold at the Black Orchid, where appellant was arrested.

At the very inception of the appellant's cross-examination, the prosecutor posed the question: "As you testified earlier, Mr. Wilson was also a dealer in narcotics, wasn't he?" (No such testimony had been given by Harrison; it had been given by Strait.) The question rephrased to ask whether or not Wilson was a "dealer in narcotics," brought the response that "I really didn't know." Harrison was then asked whether at times he "use[d] or possess[ed] marijuana." Upon objection by his counsel the trial court at a "bench conference," although directing the state's attorney not to elicit the fact that appellant was under indictment for the possession of marijuana, ruled that any question about such drugs would have to be "relate[d] to his relationship with Wilson, and not a general question." The prosecutor represented that he would link the appellant with Wilson by evidence placing the appellant "in the Black Orchid on August 2nd and proving that he had marijuana on him at that time." Although counsel persisted in arguing that evidence of such possession — 20 days after the commission of the homicide — would not establish "any relationship" between Wilson and Harrison concerning the sale of marijuana, the trial court ruled that the prosecutor could "ask about anything that will bear upon his relationship with Mr. Wilson."

After the appellant denied that he had ever seen any sale of marijuana in the Black Orchid, he was asked "as far as you know, there was never any marijuana in that club while you were working there?" and the appellant responded "Not until the night I got picked up." He was then asked: "On the night that you got picked up, who had marijuana in that club?" When counsel's objection was overruled, the witness responded "I did."

Evidence of another crime which the accused has committed is inadmissible in a criminal trial where such other crime is unrelated to the crime charged. *Presley v. State*, 224 Md. 550, 558, 168 A. 2d 510, 514 (1961), *cert. denied*, 368 U. S. 957 (1962), citing *Bryant v. State*, 207 Md. 565, 115 A. 2d 502 (1955). *See also Dobbs v. State*, 148 Md. 34, 46, 129 A. 275, 280 (1925). Such evidence is irrelevant where it has no tendency to prove some material fact in connection with the crime charged; it is admissible if evidence of another crime tends directly to prove the defendant's guilt of the crime charged. *Wood v. State*, 191 Md. 658, 664, 62 A. 2d 576, 578-79 (1948). Where the other crime is so linked in point of time or circumstances as to show intent or motive, the exclusion rule does not apply. *Presley v. State, supra; see also Westcoat v. State*, 231 Md. 364, 368, 190 A. 2d 544, 545-46 (1963). In *Bryant v. State, supra*, it is stated:

> "If evidence of another crime tends directly to prove the defendant guilty of the crime for which he is being tried, or if the other crime charged is so linked together in point of time or circumstances that one cannot be fully shown without proving the other, regardless of whether the crime incidentally shown is of the same or a different character from the one on trial, the general rule of exclusion does not apply. Where intent is material, the conduct of the accused is relevant to show that intent. Hence, evidence of collateral offenses is admissible, on the trial of the main charge, to prove the intent. To be admissible as relevent, such offenses need not be exactly concurrent. If they are committed within

> such time, *or show such relation to the main charge, as to make connection obvious, such offenses are admissible to show intent.* Wentz v. State, 159 Md. 161, 150 A. 278; *Callahan v. State,* 174 Md. 47, 197 A. 589; *Wood v. State,* 191 Md. 658, 664, 62 A. 2d 576." 207 Md. at 586, 115 A. 2d at 511. (emphasis added)

"The test to be applied in determining the admissibility [of evidence of such other crime] is the connection of fact proved [of the unrelated misconduct] with the offense charged, as evidence which has a natural tendency to establish the fact [of motive or intent] at issue." *Jones v. State,* 182 Md. 653, 656, 35 A. 2d 916, 918 (1944); *see also Ward v. State,* 219 Md. 559, 562, 150 A. 2d 257, 258 (1959). *In accord,* 2 J. Wigmore, *Evidence,* §§ 305-06 (3d ed. 1940).

As was stated in *Lowery v. State, supra,* at 318, 96 A. 2d at 22:

> "As a general rule, it is reversible error for the prosecution to attack the character of the accused before it has been put in issue by him, or to show other unrelated crimes or misconduct likely to cause prejudice against him. *Dobbs v. State,* 148 Md. 34, 129 A. 275.
>
> "But the rule is equally established that where the testimony shows motive or intent it is entitled to be admitted."

Upon our review of the record there is no evidence of any kind to establish that there had been any sale or distribution of narcotics or marijuana from Gary Wilson, or from the appellant, to the victim, Morgan. There is no evidence that at the time of his killing, Morgan was carrying any packets of marijuana or other narcotics which may have been taken in his robbery. Nor is there any evidence that the $213 given him by his girlfriend on the preceding evening was in any way to be used as a "bankroll" for the purchase of marijuana. Nor is there any evidence that the appellant was either a "hit" man or an "enforcer" for Gary Wilson. The

record is totally devoid of any evidence which in any way relates the packets of marijuana found in the appellant's boot — 20 days after the homicide — "to show any connection" with the decedent Morgan. If such evidence even remotely showed a "relationship" to Gary Wilson, there was utterly no nexus of that fact with the homicide.

Since evidence of acts, transactions or occurrences as to other matters with which an accused is not shown to have any connection are inadmissible, unless so inter-woven with other relevant evidence as to render the trial of his case impossible without the admission of that evidence; see *Perrera v. State*, 184 Md. 51, 56-57, 40 A. 2d 53, 55 (1944), the admission of evidence that Gary Wilson had dealt in marijuana was — without any evidence of connection — itself irrelevant, and the fact that Harrison possessed it on August 2, 1970 even more irrelevant in his trial for the murder of Morgan. It certainly failed to show any motive or intent for the homicide.

In *Dobbs v. State, supra,* at 48-50, 129 A. 281-82 (1925), this Court stated:

> "[W]hen the errors are of such a character, and so interwoven with the case, as to lead a fair and impartial mind, trained and experienced in judicial investigation, upon an examination of the whole case and all the rulings involved therein, to the conclusion that *there is a reasonable probability that such errors may have affected the determination of the case, they are prejudicial and reversible.*
>
> * * *
>
> "The defendants were indicted for a murder, and while they were required to meet that charge, they were not required without warning or notice to be prepared to defend themselves against charges relating to alleged offenses *wholly independent of and in no wise connected with that crime,* for even if they were gangsters, thieves, or homeless vagabonds, that did not tend to prove that they

committed the specific crime for which they were indicted, and the evidence in the case should have been confined to the only issue before the court, which was whether they had in fact committed that crime."

See also *Kotteakos v. United States*, 328 U. S. 750, 764-65 (1946), concerning prejudicial error.

Contrary to the view expressed by the Court of Special Appeals we conclude that in the absence of any evidence by the prosecution, showing any connection between the possession of marijuana by the appellant in his boot on August 2, 1970 and the homicide of Morgan on July 18, 1970, the trial court committed prejudicial error in admitting such evidence — notwithstanding the fact that the trial court cautiously would not permit the prosecutor to ask the appellant concerning his indictment charging the same unlawful possession.

> *Judgment of Court of Special Appeals reversed; case remanded to that court with directions to reverse the judgment of the Criminal Court of Baltimore and remand the case for a new trial; costs to be paid by Mayor and City Council of Baltimore.*

*Smith, J., dissenting*:

I would affirm.

There is no room for misunderstanding here. After Harrison's earlier statement that he told his lawyer "all about it," referring to his conversation with Strait, the record reflects the following on cross-examination by the State:

"MR. KOLMAN: Based on the Court's questions, I have one other. Did you tell your attorney, Mr. Daneman, about this case?

"THE WITNESS: Yes, I did.
"BY MR. KOLMAN:
"Q. About this conversation?
"A. Yes, I did."

It thus was abundantly plain that Harrison was saying that he told his then lawyer, Mr. Daneman, about the conversation with Strait.

Public policy should militate against sustaining Harrison's position here. What he did was to testify in his defense to a statement by a key State's witness to him inconsistent with the testimony of that witness and thus damaging to the State's case. When asked, he stated, without objection from his trial attorney, that he had advised his earlier attorney of this conversation. Then he objected when the earlier attorney was called for the purpose of impeaching this statement by denying that the defendant had ever advised him of such a conversation. Public policy can be read behind the statement of Judge Pattison for this Court in *Shawmut Mining Co. v. Padgett*, 132 Md. 397, 404, 104 A. 40 (1918), that a witness "can not be allowed, after disclosing as much as he pleases [of a communication to an attorney], to withhold the remainder." *Shawmut* was relied upon by the Court of Special Appeals.

The attorney-client privilege is intended to be a shield, not a sword. The opinion of the majority in this case turns it into a sword. Reason, the authorities, and what I regard as the better reasoned cases support my view here. The fact that Harrison testified on cross-examination does not make his testimony any less a waiver of the attorney-client privilege in the view of eminent authority. In 8 J. Wigmore, *Evidence* § 2327 (McNaughton rev. ed. 1961) the author rejected intention as the sole criterion for waiver of the privilege. He pointed out:

"In deciding [what constitutes a waiver by implication], regard must be had to the double elements that are predicated in every waiver, i.e., not only the element of implied intention, but also

the element of fairness and consistency. *A privileged person would seldom be found to waive, if his intention not to abandon could alone control the situation.* There is always also the objective consideration that when his conduct touches a certain point of disclosure, fairness requires that his privilege shall cease whether he intended that result or not. He cannot be allowed, after disclosing as much as he pleases, to withhold the remainder. He may elect to withhold or to disclose, but after a certain point his election must remain final." *Id.* at 635-36. (Emphasis added.)

Wigmore, *op. cit.*, § 2327, n. 3 at 637 rejects the position of the court in *Foley v. Poschke*, 66 Ohio App. 227, 32 N.E.2d 858 (1940), that testimony on cross-examination cannot be considered voluntary for the purposes of a statute requiring "voluntary testimony" for waiver of the attorney-client privilege, stating, "this ruling seems incorrect since the client could have refused to testify on cross-examination by invoking the privilege." In McCormick, *Evidence* § 93 (2d ed. Cleary 1972) that author also rejects the notion that failure to assert the privilege on cross-examination makes the disclosure involuntary, stating:

"Waiver includes, as Wigmore points out, not merely words or conduct expressing an intention to relinquish a known right, but conduct, such as a partial disclosure, which would make it unfair for the client to insist on the privilege thereafter.

"Of course, if the holder of the privilege fails to claim his privilege by objecting to disclosure by himself or another witness when he has an opportunity to do so, he waives his privilege as to the communications so disclosed." *Id.* at 194.

\* \* \*

"What if the client is asked on cross-examination about the communications with his lawyer, and he responds without asserting his claim of privilege? Is this a waiver? Unless there are some circumstances

which show that the client was surprised or misled, it seems that the usual rule that the client's failure to claim the privilege when to his knowledge testimony infringing it is offered, would apply here, and that *the decisions treating such testimony on cross-examination as being involuntary and not constituting a waiver are hardly supportable.*" *Id.* at 195. (Emphasis added.)

Support for the view I take here is also found in 3 Jones, *Evidence* § 21:22 at 804 (6th ed. S. A. Gard 1972); H. Underhill, *Criminal Evidence* § 333 at 840 (5th ed. 1956); and 2 Wharton, *Criminal Evidence* § 561 at 83 (13th ed. C. Torcia 1972). (These references do not deal specifically with cross-examination.) Wigmore, McCormick, and Wharton were cited by the Court of Special Appeals in support of its decision.

I think a correct statement of the law is found in *Steen v. First Nat. Bank,* 298 F. 36 (8th Cir. 1924), where the court said:

"The owner of the privilege of preventing the disclosure of confidential communications cannot, after testifying to or about them, or to or about any substantial part of them, without claiming his privilege, or objecting to testify on the ground of his privilege, invoke that privilege to prevent other parties to the communications from testifying to them. He cannot by his silence lay down the shield of his privilege, and assail another with the sword of his own testimony to the privileged communications, and, when his adversary essays to defend himself, or to attack him by his version of the testimony, or by the testimony of other parties or witnesses to such communications, again seize the shield of his privilege and shut out all testimony as to the confidential communications but his own. He has waived his privilege and 'such waiver is in no sense contrary to public policy; indeed, it is in the interest of truth and justice.'

Kelly v. Cummens, 143 Iowa 148, 151, 152, 121 N.W. 540, 542 (20 Ann. Cas. 1283); McKinney v. Grand Street, etc., R. R. Co., 104 N.Y. 352, 355, 10 N.E. 544; Yardley v. State, 50 Tex. Cr. R. 644, 100 S.W. 399, 400; Hunt v. Blackburn, 128 U. S. 464, 470, 9 Sup. Ct. 125, 32 L.Ed. 488; People v. Patrick, 182 N.Y. 131, 74 N.E. 843; Union Pacific R. R. Co. v. Thomas, 152 Fed. 365, 368, 81 C. C. A. 491; People v. Gerold, 265 Ill. 448, 107 N.E. 165, Ann. Cas. 1916A, 636; Grant v. Harris, 116 Va. 642, 82 S.E. 718, 719, 720, Ann. Cas. 1916D, 1081; Hendrickson v. People, 10 N.Y. 13, 27, 29, 61 Am. Dec. 721; People v. Molineux, 168 N.Y. 264, 333, 61 N. E. 286, 62 L. R. A. 193; Inhabitants of Woburn v. Henshaw, 101 Mass. 193, 200, 3 Am. Rep. 333; In re Bendheim (D. C.) 180 Fed. 918, 919; 28 R. C. L. p. 430.

"Nor does the fact that the testimony of Mr. Boyd to the privileged communications to Mr. Crowder was given on his cross-examination upon the preliminary hearing seem to us to deprive the waiver it wrought of its efficacy. It is neither proved nor claimed that he, the bank, or the state objected to his testifying at the preliminary examination on his cross-examination upon the ground that the subject of his testimony was privileged, or on the ground that the subject of it was not germane to his testimony upon his direct examination and legitimate cross-examination thereon. The legal presumption is that the cross-examination was legitimate, germane to and warranted by the direct examination of Mr. Boyd. That is the legal presumption, and there was no offer or claim to the contrary at the trial. In this state of the case, although we are aware that there is authority to the effect that such a waiver may not arise to matters disclosed upon cross-examination on the ground that such disclosure is not a voluntary one (Burgess v. Sims Drug Co., 114 Iowa 275, 280, 86 N.W. 307, 54 L. R. A. 364, 84 Am. St. Rep. 359), we are unable to resist

the conclusion that the stronger reasons and the more persuasive authorities sustain the rule that the waiver extends to every disclosure of the privileged communications made in a legitimate cross-examination upon the subject-matter of the testimony given upon the direct examination." *Id.* at 41-42.

After citing 28 Ruling Case Law, *Witnesses* § 30 at 443 (1921), concluding with the statement, "Even a party to the action who voluntarily becomes a witness on his own behalf, and thus waives his privilege, cannot, on cross-examination, refuse to answer in reference to any matter testified to by him in his testimony in chief, on the ground that his answer would criminate him," the court went on to say:

"Much less can a witness do so on the ground that his testimony on his legitimate cross-examination tends to disclose a privileged confidential communication against the disclosure of which he did not assert his privilege before or when he testified regarding the transaction upon either direct or cross examination. Inhabitants of Woburn v. Henshaw, 101 Mass. 193, 200, 3 Am. Rep. 333; State v. Andrews, 82 Vt. 314, 73 Atl. 586, 137 Am. St. Rep. 1008; Commonwealth v. Mullen, 97 Mass. 545, 546; Ex parte Senior, 37 Fla. 1, 19 South. 652, 653, 32 L. R. A. 133; State v. Fay, 43 Iowa 651, 653; State v. Wentworth, 65 Me. 234, 240, 243, 246, 247, 20 Am. Rep. 688; Foster v. Pierce, 11 Cush. (Mass.) 437, 439; Commonwealth v. Price, 10 Gray (Mass.) 472, 476, 71 Am. Dec. 668; State v. Nichols, 29 Minn. 357, 358, 13 N.W. 153; State v. K., 4 N. H. 562, 563; State v. Foster, 23 N.H. 348, 354, 55 Am. Dec. 191." *Id.* at 42.

*Willard C. Beach Air Brush Co. v. General Motors Corp.,* 118 F. Supp. 242 (D. N.J. 1953), *aff'd* 214 F. 2d 664 (3rd Cir. 1954), cited the opinion of this Court in *Shawmut Mining Co., supra,* stating:

"On the other hand, let us give plaintiff the

benefit of the remaining alternative — the consideration of Atwater's testimony. Of course, if Atwater's testimony is to be considered, at least insofar as the communications as to the motivation for settlement are concerned between Beach and Brown, at Brown's office, these normally confidential communications between attorney and client are immediately divested of their privilege if Atwater, as the agent of Beach, testifies in open court as to them. This act as Beach's agent is that of Beach, and *Beach, by testifying and telling the public of these confidential communications, has turned what was once a confidence into public property.* He cannot open the door to part of the facts and close it as to the remainder. 8 Wigmore, (3rd Ed.) Sec. 2327; Shawmut Mining Co. v. Padgett, 1918, 132 Md. 397, 104 A. 40; Wild v. Payson, D.C.S.D.N.Y. 1946, 7 F.R.D. 495; Roper v. State, Sup. Ct. 1896, 58 N.J.L. 420, 33 A. 969." *Id.* at 247. (Emphasis added.)

*Knowlton v. Fourth-Atlantic Nat. Bank,* 264 Mass. 181, 162 N. E. 356 (1928), concerned a suit between an individual, Chamberlain, and a bank. Chamberlain died and Knowlton, the executrix, was substituted in his stead. Chamberlain testified on cross-examination that he told his attorney, Bailey, of a conversation with the president of the bank, which conversation was the basis of the agreement then before the court. The attorney was called as a witness on behalf of the defendants and asked by counsel for the bank, as one of the defendants, whether Chamberlain had told him that he had entered into an agreement with the bank president as outlined. The court said:

"This question was excluded, and the bank made the offer of proof, namely, that the witness if required to answer would testify that Chamberlain never did tell him the things contained in the defendant's question, that is, that his answer would be 'No.' It is said in *Woburn v. Henshaw,* 101 Mass. 193, at page 200: 'The policy of the law will not

allow the counsel himself to make disclosures of confidential communications from his client; but if the client sees fit to be a witness, he makes himself liable to full cross-examination like any other witness'; and it was said in *Gossman v. Rosenberg,* 237 Mass. 122, at page 124, 'a voluntary witness waives every personal privilege.' The privilege against the disclosure of confidential communications between attorney and client is personal to the client and may be waived by him. *Phillips v. Chase,* 201 Mass. 444, 450. See *Montgomery v. Pickering,* 116 Mass. 227; *McCooe v. Dighton, Somerset, & Swansea Street Railway,* 173 Mass. 117. The evidence was admissible. The exception argued must be sustained." *Id.* at 196.

Also see *Hunt v. Blackburn,* 128 U. S. 464, 32 L. Ed. 488, 491, 9 S. Ct. 125 (1888) (cited in *Steen*); *Louisville & N.R.R.,* 115 Ala. 334, 349-50, 22 So. 163 (1897); *Tripp v. Chubb,* 69 Ariz. 31, 35, 208 P. 2d 312 (1949); *People v. Ottenstror,* 127 Cal.App.2d 104, 110, 273 P. 2d 289 (1954); *Key v. State,* 235 Ind. 172, 174-177, 132 N.E.2d 143 (1956); *Fluty v. State,* 224 Ind. 652, 659, 71 N.E.2d 565 (1947); *Oliver v. Pate,* 43 Ind. 132, 142-43 (1873); *Swanson v. Domning,* 251 Minn. 110, 118, 86 N.W.2d 716 (1957) (citing and quoting from *Steen*); *Cerney v. Paxton & Gallagher Co.,* 83 Neb. 88, 92, 119 N. W. 14 (1908) ("We think that, when the plaintiff testified to a conversation between himself and his attorney, he waived the privilege of such attorney, who thereupon became a competent witness to testify concerning the matters already disclosed in open court by his client. Any other rule would enable the client to use as a sword the protection which is awarded him as a shield."); *People v. Farmer,* 194 N. Y. 251, 269, 87 N. E. 457 (1919); *State v. Sullivan,* 230 Ore. 136, 368 P. 2d 81, *cert. denied* 370 U. S. 957 (1962); *Martin v. Shaen,* 22 Wash. 2d 505, 513, 156 P. 2d 681 (1945); and *Bennett v. Bennett,* 137 W. Va. 179, 186-87, 70 S.E.2d 894 (1952). In the light of the majority's reliance upon *People v. Kor,* 129 Cal.App.2d 436, 277 P. 2d 94 (1955), I find of interest that McCormick, *op. cit.,* § 93 at 194 in n. 15 states relative to

that case, "The decision is criticized, it seems soundly, in Note 2 U.C.L.A.L. Rev. 573."

On the second point the Court of Special Appeals said in its unreported opinion:

"Appellant contends that there was error, prejudicial to him, in permitting Strait to testify . . . that Gary Wilson, appellant's employer, was a dealer in narcotics . . . .

\* \* \*

"Evidence by which the State sought to show activities of Gary Wilson in addition to operating the Black Orchid nightclub, and, at least by inference, activities of appellant as Wilson's employee, were directed at showing motive for the same crime for which appellant was on trial. Evidence that Wilson was a marihuana dealer led also to cross examination of appellant on that point, and brought out that when appellant was arrested on 2 August 1970 the police found several packets of marihuana in one of his boots. The trial judge limited this phase of appellant's cross examination to questions designed to bring out appellant's relationship to his employer's activities as a marihuana dealer.

"Appellant argues that all of this evidence was an attack on his character, and thus on his credibility, by showing other unrelated criminal activity.

"We held in Neam v. State, 14 Md. App. 180 (1972) that the fact of narcotics addiction could not be considered on the issue of credibility of the witness. See also Jones v. State, 17 Md. App. 504 (1973).

"The Court of Appeals, through Chief Judge Sobeloff, said in Lowery v. State, 202 Md. 314 (1953), at 318:

'As a general rule, it is reversible error for the prosecution to attack the character of the accused before it has been put in issue by him,

or to show other unrelated crimes or misconduct likely to cause prejudice against him. *Dobbs v. State,* 148 Md. 34, 129 A. 275.

'But the rule is equally established that where the testimony shows motive or intent it is entitled to be admitted.'

"In its quest for evidence of a motive the State produced very little of any substantial weight, but failure to succeed does not affect the relevancy of the attempt. We think the evidence was relevant to motive or intent, and was admissible for that purpose. It did not become inadmissible because it may have involved overtones of character."

The prosecutor's attempt to show a motive for the killing was probative, just as was the case in *Lowery,* cited by the Court of Special Appeals. The weight of the evidence should be left to the jury. The prosecutor's theory was neither outrageous nor ridiculous. It was his theory that Harrison was an "enforcer" in Gary Wilson's drug trafficking operation and that he was in the process of collecting money due from the victim when the murder occurred. This would explain why the victim was holding Harrison's arms and why the right side of the pants of the victim, including the pocket, had been ripped out.

I think in both instances the Court of Special Appeals correctly stated the law and correctly applied it to the facts of this case. Chief Judge Murphy authorizes me to say that he joins in the views here expressed as to the first point only.